UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DODGE DATA & ANALYTICS LLC, | : | Case No. 1:15-cv-698 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| iSqFt, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS (Doc. 29)**

This civil action is before the Court on Defendants'[1] motion to dismiss the

amended complaint (Doc. 29)[2] and the parties' responsive memoranda (Docs. 32, 33).[3]

---

[1] Defendants include: iSqFt, Inc., Construction Market Data Group, LLC ("CMD"), Construction Data Corporation, LLC ("CDC"), and BidClerk, Inc. (collectively "Defendants"). iSqFt is a software-as-a-service company that licenses access to its construction software and databases to general contractors, subcontractors, manufacturers, and suppliers in the North American commercial construction industry. iSqFt acquired BidClerk in October 2014, CDC in April 2015, and CMD in August 2015. (Doc. 28 at ¶¶ 45-46).

[2] Also pending before the Court is a motion to dismiss (Doc. 26) that was filed before Plaintiff Dodge Data amended its complaint. (Doc. 28). The amended complaint rendered the motion to dismiss (Doc. 26) moot. *Computerease Software, Inc. v. Hemisphere Corp.*, No. 06cv247, 2007 U.S. Dist. LEXIS 64753, at *1 (S.D. Ohio Mar. 19, 2007) ("Since the amended complaint replaces the original complaint, the motion to dismiss the original complaint is moot."). Accordingly, the first motion to dismiss (Doc. 26) is **DENIED** as **MOOT**.

[3] The parties request oral argument. (Doc. 29 at 1 and Doc. 32 at 1). The Court finds that the pleadings are clear on their face, and that oral argument and/or an evidentiary hearing is not necessary. *See Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (J. Dlott) ("Local Rule 7.1(b)(2) leaves the court with discretion to grant a request for oral argument.").

## I.  FACTS <u>AS ALLEGED</u> BY THE PLAINTIFF

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to Plaintiff Dodge Data; and (2) take all well-pleaded factual allegations as true.  *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

Dodge Data provides Construction Project Information ("CPI").  (Doc. 28 at ¶ 20). CPI consists of "construction project information, building product information, construction plans and specifications, industry news, market research, and industry trends and forecasts."  (*Id.*)  Dodge Data sells its nationwide CPI product to customers "through web-based programs accessed by those customers who pay a subscription fee to Dodge." (*Id.* at ¶ 24).  The subscription "depend[s] upon the level of detail and geographical area in which the contractor [i]s interested, as well as the number of licenses purchased by the contractor."  (*Id.* at ¶ 26).

Dodge Data claims that Defendants are attempting to monopolize the market for nationwide CPI in the United States and Canada (the relevant market), in violation of the Sherman Antitrust Act.  Dodge Data alleges that Defendants' goal is to consolidate into one entity with market power, drive Dodge Data from the market, and acquire a 100% market share so that they can charge monopoly prices, reduce output, and stifle innovation to the detriment of consumers.

Dodge Data alleges that Defendants are attempting to achieve their goal through anticompetitive conduct, including a predatory pricing scheme in which they have offered prices to Dodge Data's customers (but not to their own customers), that are more than

85% below Dodge Data's prices and below any appropriate measure of Defendants' costs. Defendants have also allegedly stolen and used Dodge Data's confidential customer information, infringed Dodge Data's trademarks, abused restrictive covenants, and tortiously interfered with Dodge Data's business relationships.

Dodge Data alleges claims for: (1) attempt to monopolize in violation of Section 2 of the Sherman Act; (2) conspiracy to monopolize in violation of Section 2 of the Sherman Act; (3) conspiracy in restraint of trade in violation of Section 1 of the Sherman Act; (4) trademark infringement of the "S" (Sweets) mark; (5) unfair competition concerning the "S" (Sweets) mark; (6) dilution of the Sweets mark under Ohio law; (7) violation of the Ohio Deceptive Trade Practices Act relating to the "S" (Sweets) mark; (8) trademark infringement of the BidPro mark; (9) federal unfair competition concerning the BidPro mark; (10) violation of the Deceptive Trade Practices Act relating to the BidPro mark; (11) tortious interference with prospective business relationships; (12) trespass to chattels; and (13) declaratory judgment.

Defendants maintain that they have lawfully challenged Dodge Data's dominant market position, and so Dodge Data now seeks to undermine their competition.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a)

requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)).  Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678.  A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (*citing* Fed. Rule Civ. P. 8(a)(2)).

4

## III.    ANALYSIS

### A.  Antitrust Standing

"[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [it] must [be] dismiss[ed]… as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be." *NicStand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (*en banc*).[4]  A district court decides whether a plaintiff has adequately pleaded antitrust standing by balancing five factors: "(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation." *Southhaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983).

Here, Defendants argue that Dodge Data does not have antitrust standing because it has not properly plead an antitrust injury.  An antitrust injury is an: (1) "injury of the type the antitrust laws were intended to prevent" and (2) injury that "the flows from that which makes defendants' acts unlawful." *In re Cardizem CD Antitrust Litig.*, 332 F.3d

---

[4]  "[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012).

896, 909 (6th Cir. 2003). "[B]ecause the purpose of the antitrust laws is to protect competition rather than competitors, a plaintiff must allege injury, not only to himself, but to a relevant market. Thus, failure to allege an anti-competitive impact on a relevant market amounts to a failure to allege an antitrust injury." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). This requirement means that "one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." *NicSand, Inc.*, 507 F.3d at 450. Specifically, "a plaintiff must put forth factual allegations plausibly suggesting that there has been an adverse effect on prices, output, or quality of good in the relevant market as a result of the challenged actions." *Guinn v. Mount Carmel Health*, No. 2:09cv226, 2012 U.S. Dist. LEXIS 24353, at *14 (S.D. Ohio Feb. 27, 2012).[5]

Here, Dodge Data not only alleges competition, it alleges that Defendants have engaged in illegal predatory pricing. Predatory pricing "harms both competitors and competition," and is "capable of inflicting antitrust injury." *Cargill Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117-118 (1986). The Supreme Court has noted that a predatory pricing scheme creates antitrust injury:

---

[5] "[A]n antitrust plaintiff must show that (1) the alleged violation tended to reduce competition overall and (2) the plaintiff's injury was a consequence of the resulting diminished competition." *J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*, 485 F.3d 880, 887 (6th Cir. 2007). This requires a demonstration, "as a threshold matter, 'that the challenged action has had an actual adverse effect on competition as a whole in the relevant market." *George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2nd Cir. 1998).

> This does not necessarily mean, as the Court of Appeals feared, that § 4 plaintiffs must prove an actual lessening of competition in order to recover. The short-term effect of certain anticompetitive behavior—predatory below-cost pricing, for example—may be to stimulate price competition. But competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n. 14 (1977).[6] "When the defendant effectively sells below its own costs, it puts pressure on its competitors to lower prices without actually lowering its own costs or otherwise creating a market efficiency. This is sufficient for competitors to have antitrust standing." *Collins Inkjet Corp. v. Eastman Kodak Co.,* 781 F.3d 264, 275 (6th Cir. 2015).[7]

Competition between Dodge Data and CMD (and later iSqFt/CMD) over the years has necessitated that each company improve its product quality and increase innovation in order to keep up with its rival. Dodge Data argues that if it is forced from the market, Defendants would raise prices to supra-competitive levels and innovation and product quality would suffer. (Doc. 28 at ¶¶ 65-66).

Accordingly, Dodge Data has alleged antitrust injury sufficient to establish standing.

---

[6] *See also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339-40 (1990) ("[a]ntitrust injury does not arise for purposes of § 4 of the Clayton Act until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct, in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect").

[7] *See also Amarel v. Connell*, 102 F.3d 1494, 1508 (9th Cir. 1996) ("[l]osses a competitor suffers as a result of predatory pricing is a form of antitrust injury because 'predatory pricing has the requisite anticompetitive effect' against competitors").

### B.    Attempted Monopolization

Dodge Data alleges a claim for attempted monopolization in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.  A claim for attempted monopolization requires: "(1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success."  *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 615 (6th Cir. 1993).  Market strength that approaches monopoly power, meaning the ability to control prices and exclude competition, is a necessary element for showing a dangerous probability of achieving monopoly power.  *Id.*  However, courts have not adopted a uniform standard regarding the threshold of what it takes to establish a monopoly power.  "[M]arket share alone, however, is not enough to determine a firm's capacity to achieve monopoly . . . [t]he real test is whether [the defendants] possessed sufficient market power to achieve its aims."  *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982).

#### 1.    *Specific intent to monopolize*

"Specific intent to monopolize may be inferred from evidence of anticompetitive conduct, but not from legitimate business practices aimed only at succeeding in competition."  *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1432 (6th Cir. 1990).  Defendants argue that Dodge Data has pled nothing more than "heated competition."

Dodge Data alleges that Defendants: (i) began predatory pricing shortly after CMD's president instructed his sales staff to do "whatever it takes to disrupt Dodge

Data's business"; (ii) provided its two leading sales people with a list of 50-70 Dodge

Data customers and instructed those sales people to concentrate full-time on converting

those customers to CMD; (iii) provided those employees with special bonuses that could

equal $100,000 a year depending on their success in converting Dodge Data's customers;

(iv) directed its inside sales force to specifically target Dodge Data customers and told

those salespeople to convert those customers no matter what the price; (v) had prices

approved by the top management of iSqFt/CMD that were well below iSDqFt/CMD's

average total cost and average variable cost; and (vi) sold to Dodge Data's customers at a

price which was well below (at times hundreds of thousands of dollars below) the price

necessary to actually win the account (and below prices offered to iSqFt/CMD's own

customers).  (Doc. 28 at ¶¶ 58-61).

Accordingly, and as discussed in more detail *infra* at Section III.B.2, Dodge Data

has pleaded specific intent to monopolize.  *See, e.g., Tops Mkts., Inc. v. Quality Mkts.,*

*Inc.*, 142 F.3d 90, 101 (2d Cir. 1998) ("defendants' intent can be derived from their

words" and "their stated goal of preventing [the plaintiff] from entering the [] market").[8]

---

[8]  *See also D.E. Rogers Assocs., Inc. v. Gardner-Denver Co.*, 718 F.2d 1431, 1435 (6th Cir.
1983) ("the relationship between act and intent in attempted monopolization claims is a close
one" and "evidence of anticompetitive conduct may be used to support a finding of intent where
direct evidence of intent is unavailable"); *Scooter Store, Inc. v. Spinlife.com*, 777 F. Supp.2d
1102, 1116 (S.D. Ohio Mar. 28, 2011) (conduct showing a "desire to crush competitors" shows a
specific intent to monopolize).

## 2. *Anticompetitive conduct*

Anticompetitive conduct is any conduct that "attempt[s] to exclude rivals on some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). "Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 951 (6th Cir. 2005).

Dodge Data has alleged anticompetitive conduct consisting of: (i) predatory pricing; (ii) the use of the stolen customer information to compete; (iii) the intentional infringement of trademarks; (iv) the attempt to acquire market power through merger; and (v) restricting the availability of qualified employees by requiring them to sign invalid non-compete agreements. (Doc. 28 at ¶ 99). In determining whether Dodge Data has alleged anticompetitive conduct, "[t]he fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact." 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* at ¶ 310c7 (Aspen Publishers 3d ed. (2008)).[9] The Court will consider each of these alleged acts of anticompetitive conduct in turn.

---

[9] "The evidence supported [plaintiff's] theory that [defendant's] interrelated practices successfully limited competition. [Defendant] once again attempts to divide the practices into discrete, distinct activities, each of which prior courts may have found to be lawful . . . Defendant argues that no one instance of improper conduct standing alone would lead to § 2 liability. However, taken together, they show a pattern of exclusionary behavior sufficient to support the jury verdict." *Conwood Co. v. U.S. Tobacco Co.*, No. 5:98-cv-108-R, 2000 U.S. Dist. LEXIS 12761, at *11 (W.D. Ky. Aug. 10, 2000).

### a. Predatory pricing

A plaintiff seeking to plead predatory pricing must plead that "the prices complained of are below an appropriate measure of its rival's costs" and that the defendant had a "dangerous probability…of recouping its investment in below-cost prices." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993).

> [W]e hold that to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a *prima facie* case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

*Spirit Airlines, Inc.,* 431 F.3d at 938.[10]

Since Dodge Data does not yet have access to Defendants' costs, Dodge Data uses its knowledge of its own cost structure, its knowledge of the industry, and its knowledge of iSqFt/CMD's business, to plead, upon information and belief, that Defendants' costs are below their average variable and average total cost. Dodge Data's allegations are an extrapolation of iSqFt/CMD's cost structure based upon the information that Dodge Data

---

[10] *See also Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 326 (6th Cir. 2015) (plaintiffs were allowed "the flexibility to apply a cost-based test other than average variable cost").

has: Dodge Data, as iSqFt/CMD's only competitor in the relevant market, knows about the industry; the products iSqFt/CMD offers; the basic level of costs associated with gathering, organizing, and delivering the data to customers; the costs associated with hiring, training, and compensating sales people; and the hundreds of other costs and company seeking to offer a product that is competitive with Dodge Data's products must incur. "[C]ompetitors are the best of predatory pricing plaintiffs [because], although they do not have direct information about the defendant's costs, . . . they usually know these costs better than anyone else." 3A Areeda & Hovenkamp at ¶ 723e. If a plaintiff were required to actually know a defendant's costs to even plead a predatory pricing claim, no predatory pricing case would progress beyond a motion to dismiss.

Dodge Data argues that Defendants' predatory pricing campaign began shortly after CMD's president instructed his sales staff to do "whatever it takes to disrupt Dodge's business." (Doc. 28 at ¶ 58). In support of this campaign, CMD provided its two leading sales people with a list of 50 to 70 of Dodge Data's customers (believed to have been obtained from the stolen customer information), and instructed those sales people to devote their full time to converting those customers to CMD. (*Id.* at ¶¶ 58-59). Dodge Data argues that top management at iSqFt/CMD specifically approved sales that were well below average total cost and average variable cost. (*Id.* at ¶ 60). Specifically,

iSqFt/CMD offered prices that were, in some cases, more than 85% lower than the price offered by Dodge Data. (*Id.* at ¶¶ 61-62).[11]

These facts support Dodge Data's allegations that iSqFt/CMD's pricing structure was designed more to "discipline or eliminate competition" than to secure profits for iSqFt/CMD. *Spirit Airlines*, 431 F.3d at 958. Moreover, the price at which iSqFt/CMD ultimately secured the business of Dodge Data's customers was well below the price necessary to actually win the account.[12]

### b. Use of stolen customer information

Next, Dodge Data alleges that iSqFt/CMD is currently using stolen customer information to compete against Dodge Data. (Doc. 28 at ¶¶ 39, 58, 174). Defendants contend that its receipt of the alleged stolen customer information was already litigated and is therefore barred by *res judicata*. However, claims based upon Defendants' use of the information in 2014 through the present were not litigated in the 2009 litigation and therefore are not barred by *res judicata*. Defendants' continued use of the customer information constitutes an anticompetitive act, because this usage is allegedly part of a

---

[11] iSqFt/CMD complains that Dodge Data has only set forth one example of a post-merger predatory price charged by iSqFt/CMM. Defendants, however, do not explain what the significance of the merger date is (or if it has in fact occurred). Even if the predatory pricing ceased entirely after the complaint was filed, that would not change Defendants' liability for any acts that they have allegedly already committed.

[12] If iSqFt/CMD were interested in maximizing profits, there was no reason to resort to prices that were so drastically below that which Dodge Data was offering. Therefore, Dodge Data offers sufficient facts to allege that iSqFt/CMD's pricing strategy was more concerned with eliminating Dodge Data's revenue and driving it from the relevant market than it was with its own short-term profitability.

scheme to exclude rivals on some basis other than efficiency.  Moreover, there is no requirement that the underlying "anticompetitive acts" give rise to an independent tort action.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962) (it is "well settled that acts which are in themselves legal lose that character when they become [part] of an unlawful scheme").

### c. Infringement of trademarks and use of improper restrictive covenants

Dodge Data alleges that Defendants' conduct was designed to adversely affect competition in the relevant market.  Defendants maintain that the alleged trademark infringement cannot be anticompetitive conduct, because the products associated with the infringed trademarks are in a different product market.  However, anticompetitive conduct only requires that the conduct be designed to have an anticompetitive effect on the relevant market.  *Tops Mkts, Inc.*, 142 F.3d at 100 (tortiously interfering with a contract to purchase land (real estate market), to stop plaintiff from finding a location to open a grocery store, was anticompetitive conduct affecting the grocery store market).

### d. Mergers and attempted mergers

Finally, Dodge Data argues that iSqFt attempted to acquire every player in the relevant market, including Dodge Data.  Defendants maintain, however, that Dodge Data does not and cannot allege that iSqFt planned to acquire both Dodge Data and CMD, as opposed to just one of them.

Ultimately, considering "the entire sum of [alleged] unlawful exclusionary practices and their impact" and construing the facts in the light most favorable to Dodge Data, it has pleaded numerous instances of anticompetitive conduct and specific intent to monopolize.[13] *See* Areeda & Hovenkamp at ¶ 310c7.

### 3. *Dangerous probability of success*[14]

The final element of the predatory pricing analysis is whether there is a dangerous probability of recoupment, or whether Defendants could "obtain enough market power to set higher than competitive prices, and then [could] sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 590-91 (1986). In conducting this analysis, a court should analyze the predatory pricing scheme to determine whether the scheme alleged could plausibly "produc[e] the intended effects on the firm's rivals . . . [by] driving them from the market," and then analyze "the structure and conditions of the relevant market" in order to determine whether defendants could plausibly maintain supra-competitive prices after it has eliminated its rival from the market. *Brooke Group Ltd.*, 509 U.S. at 225-27. Since this analysis is a "particularly fact-intensive inquiry," "[c]ourts typically should not resolve [it] at the pleading stage." *Broadcom Corp. v.*

---

[13] "Specific intent" for an attempted monopolization claim may be inferred from the existence of anticompetitive acts. *See, e.g.., Arthur S. Langenderfer, Inc.*, 917 F.2d at 1432.

[14] A "dangerous probability of success" requires "market strength that approaches monopoly power" and an examination of "barriers to entry." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 507 (6th Cir. 1983).

*Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007).

The predatory pricing scheme that Dodge Data alleges could plausibly result in a market where there is a "dangerous probability" that iSqFt/CMD would have monopoly power, including the power to charge supra-competitive prices, reduce output, decrease innovation, and otherwise damage competition. For example, the alleged predatory pricing scheme caused Dodge Data to lose customers with millions of dollars in annual sales volume. (Doc. 28 at ¶ 63). Further, Dodge Data has allegedly lost millions in "price erosion," where it has been forced to discount to unsustainable and unprofitable levels. (*Id.*)[15]

iSqFt/CMD has approximately 50% share of the relevant market, which is sufficient to evidence recoupment.

> A lesser degree of market power may be sufficient to establish an attempted monopolization claim than that needed to establish a completed monopolization claim. Under this lesser standard, courts will generally find a dangerous probability for success where the defendant has a market share of fifty percent or more. On the other end of the spectrum, a market share of thirty percent is presumptively insufficient to establish a dangerous probability of success. Those with market shares between thirty and fifty percent may be found to have a dangerous probability of success if other factors are present.

*Defiance Hosp., Inc. v. Fauster-Cameron, Inc.*, 344 F.Supp.2d 1097, 1116-117 (N.D.

---

[15] Defendants argue that there is some possibility that if their predatory pricing scheme continues that they, instead of Dodge Data, will exit the market. However, Defendants fail to cite any case law where a court dismissed an attempt to monopolize claim because the plaintiff attempted to survive that scheme.

Ohio 2004).[16]

Furthermore, Dodge Data maintains that this is a highly concentrated two-competitor market. A "dangerous probability" of achieving market power is more likely in a two-competitor market where each market participant has approximately an equal share, than in a market with numerous other players. In a two-player, "50%-50% market," the elimination of the plaintiff would leave the defendant with 100% of the market. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984).

Additionally, Dodge Data argues that having achieved monopoly power and the ability to charge supra-competitive prices, iSqFt/CMD would be able to maintain those prices because there are significant barriers to entry in this market. Dodge Data maintains that "[i]n the past 100 years, no company other than Dodge or CMD has occupied this market, other than in a *de minimis* way." (Doc. 28 at ¶ 55). *See, e.g., White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 507 (6th Cir. 1983) ("[t]he fact that it is difficult for a new firm to enter the industry, or that no new competitors have entered the market for a number of years, may be very important factors"). Thus, Dodge Data has pleaded sufficient facts to show that Defendants could "obtain enough market

---

[16] Defendants argue that a 50% market share is insufficient to support an attempted monopoly claim. However, there are dozens of cases stating that market shares of 50% are "generally" sufficient to support such a claim, and much lower market shares may support such a claim when there are strong barriers to entry. *See, e.g., Smith Wholesale Co. v. Philip Morris USA, Inc.*, No. 2:03cv221, 2005 U.S. Dist. LEXIS 18078 (E.D. Tenn. Aug. 16, 2005), *aff'd*, 219 F. App'x 398 (6th Cir. 2007) (Philip Morris' market share of 49-56% was sufficient to establish market power for an attempted monopolization claim).

power to set higher than competitive prices, and then [could] sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices." *Matsushita Elec. Indus. Co.*, 475 U.S. at 590-91.[17]

Finally, Defendants argue that Dodge Data's sole basis for pleading barriers to entry is its claim that there are high fixed costs, and that for there to be "substantial" barriers to entry, there must be some structural aspect unique to the market aside from cost alone. However, there is no requirement that substantial barriers to entry consist of more than high fixed costs. Furthermore, Dodge Data pleaded that a firm seeking to enter the relevant market would need: (i) a network of individuals to secure the necessary plans and specifications; (ii) a salesforce with ties throughout the United States and Canada to BPMs; and (iii) a software solution. (Doc. 28 at ¶ 54). Dodge Data argues that these items take years to develop, and there are a limited number of people with sufficient experience, contacts, and knowledge to effectively sell Nationwide CPI to BPMs. The ultimate question is whether "new entry is easy." *Brooke Group, Ltd.*, 509 U.S. at 226.

Accordingly, Dodge Data has alleged a dangerous probability of success sufficient to maintain a claim for attempted monopolization in violation of Section 2 of the Sherman Act.

---

[17] Defendants argue that a few years ago several smaller competitors began to emerge. "None of these competitors, however, was successful in obtaining more than a *de minimis* share of the relevant market for Nationwide CPI." (Doc. 28 at ¶ 41).

### C.     Conspiracy

Dodge Data alleges two antitrust conspiracy claims: (1) Defendants violated Section 2 of the Sherman Act by conspiring to monopolize the relevant market (Doc. 28 at ¶¶ 105-11); and (2) Defendants conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act (*Id.* at ¶¶ 112-17). To survive the motion to dismiss, Dodge Data must allege that: "(1) two or more entities engaged in a conspiracy, combination, or contract, (2) to effect a restraint or combination prohibited per se (wherein the anticompetitive effects within a relevant geographic and product market are implied), (3) that was the proximate cause of [Dodge Data's] antitrust injury." *Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 342-43 (6th Cir. 2006).

First, Defendants argue that the conspiracy claims fail because Dodge Data only alleges unilateral conduct. However, Dodge Data alleges a multilateral conspiracy between four entities – iSqFt, CMD, BidClerk, and CDC. (Doc. 28 at ¶¶ 45-48). Specifically, Dodge Data alleges that these entities are attempting to jointly drive Dodge Data from the market and otherwise restrain trade, by offering customers predatory pricing, trademark infringement, and by using of Dodge Data's stolen customer information to tortiously interfere with its customers. (*Id.* at ¶¶ 58-64, 67-94)

Next, Defendants argue that commonly held entities cannot conspire among themselves. However, where the original purpose of a merger was to restrain trade or monopolize a market (as is alleged here), the prohibition against intra-company conspiracies no longer applies.

> It has long been clear that a pattern of acquisitions may itself create
> a combination illegal under § 1, especially when an original anti-
> competitive purpose is evident from the affiliated corporations'
> subsequent conduct. The *Yellow Cab* passage is most fairly read in
> light of this settled rule. In *Yellow Cab*, the affiliation of defendants
> was irrelevant because the original acquisitions were themselves
> illegal. An affiliation "flowing from an illegal conspiracy" would not
> avert sanctions. Common ownership and control were irrelevant
> because restraint of trade was "the primary object of the combination."

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 761 (1984). Even if the original

purpose of the merger were not to unreasonably restrain trade or to monopolize a market,

a merger does not insulate parties from joint actions taken before the merger. *Omnicare,*

*Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697 (7th Cir. 2011) (examining pre-merger

conduct to determine if there was a combination or conspiracy). Moreover, whether the

defendant entities have actually merged, when that merger took place (if at all), and the

form of that merger (if it happened) are unclear. As of the date of the Amended

Complaint, each defendant existed as a separate legal entity, maintained separate and

distinct websites, and continued to appear as separate, competitive entities in the

marketplace. (Doc. 32 at 37). Whether and to what extent Defendants have integrated is

a fact-specific inquiry inappropriate for determination on the pleadings. *See, e.g., Med.*

*Ctr. at Elizabeth Place v. Atrium Health Sys.*, No. 3:12-cv-26, 2012 U.S. Dist. LEXIS

123408 at *22 (S.D. Ohio Aug. 30, 2012) (denying motion to dismiss and noting that

"[d]efendants fail to point to any case whether a court has decided this factually-driven

issue [of a single entity status] on a motion to dismiss").

Accordingly, Dodge Data has alleged sufficient facts (*see supra* Sections III.A&B) to maintain claims for antitrust conspiracy.

### D.    Trademark Claims

To state a claim of trademark infringement, "a plaintiff must allege facts establishing that: (1) [the plaintiff] owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion."  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)).  "The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  *Id.* at 610.  "Generally, dismissal for failure to state a claim upon which relief can be granted is appropriate in only the most extreme trademark infringement cases, such as where goods are unrelated as a matter of law, since the likelihood of confusion is generally a question of fact."  *Id.* at 613.[18]

The Sweets Mark:  With respect to Sweets, Dodge Data asserts two types of trademarks.  First, it asserts the Sweets registered marks, which consist of a stylized, block-letter "S" inside a solid circle.  (Doc. 28, Ex. A).  Since these marks are depicted in black and white (and do not contain any markings indicating color), they are not limited to any specific color.  *See* 37 C.F.R. § 2.52 (2016); 3 McCarthy on Trademarks and

---

[18] *See also Just Enters., Inc. v. Nurenberg Paris Heller & McCarthy Co.*, No. 1:07cv1544, 2008 U.S. Dist. LEXIS 39281, at *4 (N.D. Ohio May 12, 2008) (holding that "the question of likelihood of confusion is best resolved after discovery on summary judgment").

Unfair Competition § 19:58 (4th ed. 2016). Second, Dodge Data asserts common law rights in the same block-letter "S" symbol where the "S" symbol is depicted in white and set inside a solid distinctive green circle. (Doc. 28 at ¶¶ 73-75, 126-32). The offending Sweets mark consists of the same "S" element—a block-letter, stylized "S"—and adds small tabs to the top and bottom of the "S" in order to turn the "S" into a dollar sign.[19] This symbol is then set upon a solid green circle that is allegedly the same shade of green used by Dodge Data for decades. (*Id.*)

Here, Dodge Data has sufficiently alleged that the marks in question are similar, that the goods are sold in the same market, and that a purchaser could mistake the marks for the wrong product. These allegations meet the low standard in *Hensley* and are enough to survive a motion to dismiss. *See, e.g., Tovey v. Nike, Inc.*, No. 1:12cv448, 2013 U.S. Dist. LEXIS 16084, at *15 (N.D. Ohio Feb. 6, 2013).

The "Dodge BidPro" Mark: With respect to the BidPro mark, Dodge Data asserts two types of trademark rights: those arising out of its registered "Dodge BidPro" mark and those arising out of the common law. (Doc. 28 at ¶¶ 139-154).

The BidPro registered mark is a standard character mark, which means it is not limited "to a particular font, style, size, or color." (Doc. 28., Ex. B). *Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1349 (Fed. Cir. 2011) (standard character

---

[19] Defendants argue that the dollar sign used on CDC's website cannot be confused with Dodge Data's "S" or the advertisement that it is inviting customers to "Advertise with Construction Data" Corporation (CDC), not in the Sweets catalog. (Doc. 28 at ¶ 77).

marks "are not limited to any particular presentation"). The offending Bid Pro mark is "Invitation to Bid Pro" and is used by CDC to mark a product that "directly competes" with "Dodge's BidPro." (Doc. 28 at ¶¶ 85-87). Dodge Data argues that the construction of the offending Bid Pro mark is such that it actually appears to be inviting the reader to use Dodge Data's service and has caused at least one instance of actual confusion. (*Id.* at ¶ 88).

Defendants argue that Dodge Data's misleading use of "BidPro" to describe its mark is improper because the registered mark is "Dodge BidPro," not merely "BidPro." CDC's product is called "Invitation to Bid Pro." Furthermore, Defendants argue that Dodge Data's customers are different than CDC's customers. Specifically, the purchasers of Dodge Data's product are "subcontractors," while CDC's customer base constitutes individuals who want access to subcontractors and suppliers. (Doc. 28 at ¶ 80). Therefore, Defendants argue that there is no likelihood of confusion by Dodge Data's subcontractor customers.

First, the fact that Dodge Data's mark includes the word "Dodge" -- but the offending Bid Pro mark does not -- is irrelevant because the mark need not be identical; it need only cause a likelihood of confusion. Second, Dodge Data alleges that CDC uses BidPro "to promote a product that directly competes with [Dodge] BidPro" (Doc. 28 at ¶ 87), so Defendants' allegation that the products do not actually compete is a factual issue, and, therefore, improper for resolution on a motion to dismiss. Moreover, the offending Bid Pro mark has already caused at least one instance of actual confusion.

(Doc. 28 at ¶ 88).  *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir. 1997) (while the lack of actual confusion "is rarely significant," the existence of actual confusion is the "best evidence of likelihood of confusion").

Accordingly, Dodge Data has alleged claims for trademark infringement.

### E.     State Law Claims

####     *1.     Choice of law analysis*

When considering the state-law claims, a court must first determine which state's law applies.  This Court, as a federal district court sitting in Ohio, applies Ohio's choice-of-law rules.  *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996).  Ohio "follows the Restatement (Second) of Conflict of Laws in making choice-of-law determinations in tort actions."  *MV Circuit Design, Inc. v. Omnicell, Inc.*, No. 1:14cv2028, 2015 U.S. Dist. LEXIS 37688, at *37 (N.D. Ohio Mar. 24, 2015).  Accordingly, "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit."  The burden of proving this conflict rests with the party disputing the application of local law.  *Akro-Plastics v. Drake Indus.*, 685 N.E.2d 246, 248 (Ohio 1996)  If, after applying the relevant factors, either state would be appropriate, the court should apply the law of the forum state.  *Carder Buick-Olds Co., Inc. v. Reynolds & Reynolds, Inc.*, 775 N.E.2d 531, 544 (Ohio App. 2002).

24

Within the context of tort actions, to determine the state with the most significant relationship to the cause of action, Ohio courts consider "(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; [and] (4) the place where the relationship between the parties, if any, is located." *Nicula v. Nicula*, No. 84049, 2009 Ohio App. LEXIS 1773, at *16 (Ohio App. May 7, 2009).[20]

Dodge Data claims that New York law applies because the place of injury is New York, where Dodge Data is based and where its customer database is maintained. Defendants maintain that Ohio law applies, because Ohio has a more significant relationship to the lawsuit since: (1) the pricing decisions and use of confidential customer information occurred in Ohio (Doc. 28 at ¶¶ 58-64); and (2) four of the five parties have their principal place of business in Ohio (*Id.* at ¶¶ 8-11). Considering these facts, Dodge Data's express statements that Defendants' tortious acts "arise, and have caused injury, in Ohio," [21] and that the forum state is favored where either state's law would be appropriate, the Court finds that Dodge Data has not met its burden of establishing that New York law applies.

---

[20] The place where the tortious conduct occurred is the place where the relationship, if any, between the parties centered. *Amon v. Grange Mut. Cas. Co.*, 678 N.E.2d 1002, 1005 (Ohio 1996).

[21] (Doc. 28 at ¶¶ 15-18).

### 2. *Tortious interference*

Under Ohio law, "[t]he tort of interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another." *Harris v. Bornhorst*, 513 F.3d 503, 523 (6th Cir. 2008). To state a claim for tortious interference with business relations, a plaintiff must allege: (1) a business relationship; (2) the tortfeasor's knowledge of the relationship; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages. *Dolan v. Glouster*, 879 N.E.2d 838, 847 (Ohio App. 2007).

Here, Dodge Data alleges that Defendants intentionally interfered with its prospective business relations with numerous customers by using "dishonest, unfair, and improper means." (Doc. 28 at ¶¶ 171-76). Specifically, Dodge Data alleges that both Defendants' use of the stolen customer information to identify and solicit customers, and Defendants' predatory pricing, tortuously interfered with Dodge Data's prospective business relations. (Doc. 28 at ¶¶ 171-176). *See, e.g., Guinn*, 2012 U.S. Dist. LEXIS 24353 at 35-37.

In response, Defendants first maintain that this claim should be dismissed because Dodge Data has failed to identify a single customer that it has lost which is an essential element to its interference claim. However, Dodge Data identifies nine customers that it

Alleges it lost as a result of Defendants' below-cost sales.  (Doc. 28 at ¶ 61).[22]

Next, Defendants argue that "below cost pricing" cannot provide the necessary wrongful conduct to support a claim for tortious interference.  However, conduct that is in violation of antitrust provisions may be improper conduct sufficient to support tortious interference.  Restatement (Second) of Torts § 767 cmt. a (2015).

Accepting Dodge Data's allegations as true, and drawing all justifiable inferences in its favor, the Court concludes that Dodge Data has sufficiently pleaded a claim for tortious interference with business relationships.

### 3.    *Trespass to Chattels*

Dodge Data claims that Defendants physically interfered with the use of Dodge Data's customer information by stealing it and using it to target Dodge Data's customers. (Doc. 28 at ¶¶ 178-179).  Dodge Data maintains that Defendants use of the stolen information constitutes a trespass and interference with Dodge Data's rights.  (*Id.* at ¶ 181).

 "A trespass to chattel occurs when one intentionally disposes another of their personal property."  *Mercer v. Halmbacher*, 44 N.E.3d 1011, 1017 (Ohio App. 2015).

> One who commits a trespass to a chattel is subject to liability to the
> possessor of the chattel if, but only if, (a) he dispossesses the other
> of the chattel, or (b) the chattel is impaired as to its condition,
> quality, or value, or (c) the possessor is deprived of the use of the
> chattel for a substantial time, or (d) bodily harm is caused to the

---

[22] Defendants do not cite any case law that requires a plaintiff to identify customers that it lost at the pleading stage.

possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest.

*CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1021-22 (S.D. Ohio 1997) (citing Restatement (Second) of Torts § 218 (1965)).[23]  "An unprivileged use or other intermeddling with a chattel which results in actual impairment of its physical condition, quality or value to the possessor makes the actor liable for the loss thus caused."  *Id.* at 1022.  "[T]he word 'chattels' is ordinarily limited to visible, tangible, movable personable property, although it 'may be used in the broader sense."  *Universal Tube & Rollform Equip. Corp. v. YouTube, Inc.*, 504 F. Supp.2d 260 (N.D. Ohio 2007).[24]

Defendants maintain that Dodge Data's trespass to chattels claim fails because trespass to chattels relating to improper access of a computer database requires that there be some "physical damage" to the database.[25]  However, in *CompuServe*, the court found that physical damage was not required where the value of the chattel diminished.  962 F.

---

[23] "While authority under Ohio law respecting an action for trespass to chattels is extremely meager, it appears to be an actionable tort."  *Id*. at 1021.

[24] Trespass to chattels has been described as the "little brother to conversion."  *State v. Herbert*, 358 N.E.2d 1090, 1106 (Ohio 1976).

[25] "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel.  In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected . . . Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference."  Restatement (Second) of Torts § 218, Comment e (2015).

Supp. at 1022.  Here, Dodge Data has alleged that it was injured as a result of Defendants' conduct.  The Court's discussion of that conduct and subsequent injury (*see supra* at Section III, A-C) supports a finding that the alleged damage sustained by Dodge Data is sufficient to maintain an action for trespass to chattels.  *See CompuServe*, 962 F. Supp. at 1023.

### F.    Declaratory Relief

Dodge Data seeks declaratory judgment finding that the restrictive covenants that Defendants require their employees to sign are overly broad, unreasonable, and invalid. (Doc. 28 at ¶¶ 184-89).

First, Defendants argues that their restrictive covenants are legal and enforceable in each state in which they are consummated: Ohio, Florida, Georgia, and Illinois. However, none of these states has a rule that restrictive covenants are always valid, instead each holds that only restrictions that are "reasonable" in scope are valid and enforceable.  *See, e.g., Rotex Global, LLC v. CPO Wirecloth & Screens, Inc.*, No. 1:16cv244, 2016 U.S. Dist. LEXIS 24540, at *5 (S.D. Ohio Feb. 29, 2016) ("[n]oncompetition and nonsolicitation agreements that are reasonable are enforced"); *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1333 (M.D. Fla. 2010) (Florida statute "permits the enforcement of contracts restricting or prohibiting competition during or after the term of the restrictive covenant so long as such contacts are reasonable in time, area, and line of business"); Ga. Code Ann. § 13-8-53 (2012) (permitting restrictive covenants only when they meet certain conditions); *Cambridge Eng'g, Inc. v. Mercury*

*Partners 90 BI, Inc.*, 879 N.E.2d 512, 522 (Ill App. 2007) (noting that "[f]or a restrictive covenant to be valid and enforceable in Illinois, the terms must be 'reasonable and necessary to protect a legitimate business interest of the employer.'"). "In determining whether restrictive covenants should be enforced, the facts of each case are paramount," and therefore it is inappropriate to decide these issues on a motion to dismiss. *Rotex Global, LLC*, 2016 U.S. Dist. LEXIS 24540 at 12 (denying motion to dismiss relating to restrictive covenants).

Second, Defendants maintain that Dodge Data's declaratory judgment claim is too hypothetical, because iSqFt/CMD did not threaten litigation, but only advised Dodge Data that iSqFt's former employees may not solicit iSqFt's customers and employees. The standard is whether the "facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Considering all of the circumstances in the light most favorable to Dodge Data, the Court finds that Dodge Data has alleged sufficient facts to meet this standard.

Finally, Defendants argue that Dodge Data failed to plead any specific facts about any specific covenant, which highlights the absence of an actual controversy as required by the Declaratory Judgment Act. 28 U.S.C. § 2201. However, Dodge Data alleged that it did not hire any of Defendants' former employees who were subject to restrictive covenants "due to the uncertainty" created by the restrictive covenants. (Doc. 28 at

¶ 186).  Defendants have clearly taken a contrary position.  (*Id.*, Ex. C).  Dodge Data is in the position of pursuing "arguably illegal behavior" or "abandoning its right to do [so]." *MedImmune, Inc.*, 549 U.S. at 129.  The "dilemma" created by "putting the challenger to the choice between abandoning his rights or risking prosecution" is "'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'"  *Id.*

Accordingly, Dodge Data has stated a claim for declaratory judgment.

## IV.   CONCLUSION

For these reasons, Defendants' motion to dismiss (Doc. 29) is **DENIED**.

**IT IS SO ORDERED**.

Date:  4/28/16                                            *s/ Timothy S. Black*
                                                         Timothy S. Black
                                                         United States District Judge

31