## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **DODGE DATA & ANALYTICS LLC,** | : | |
| | : | **Civil Action No.  1:15-cv-00698** |
| **Plaintiff,** | : | |
| | : | **Judge Timothy S. Black** |
| vs. | : | |
| | : | |
| **iSqFt, INC.; CONSTRUCTION MARKET DATA** | : | |
| **GROUP, LLC; CONSTRUCTION DATA** | : | |
| **CORPORATION, LLC; BIDCLERK, INC., and** | : | |
| **iSqFt SUB, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

## SECOND AMENDED COMPLAINT

Plaintiff Dodge Data & Analytics LLC ("Dodge"), by and through its attorneys, Friedman & Wittenstein, A Professional Corporation, and Taft Stettinius & Hollister LLP, alleges as follows for its Second Amended Complaint:

## NATURE OF THE ACTION

1.      This case is about defendants' attempt to monopolize the market for providing nationwide construction project information to building products manufacturers and other customers in the United States and Canada ("Nationwide CPI").  This attempt has involved a concerted and all-out assault on Dodge through various illegal and anticompetitive acts that are specifically designed to damage Dodge.

2.      As explained more below, beginning in 2014, defendant iSqFt Sub, Inc. ("iSqFt Sub"), acquired every competitor in the market other than Dodge, including defendant iSqFt, Inc. ("iSqFt"), defendant Construction Data Corporation, LLC ("CDC"), defendant BidClerk, Inc. ("BidClerk"), and defendant Construction Market Data Group, LLC ("CMD"), which was (and

remains) Dodge's principal (and only true) competitor in the market for providing Nationwide CPI.

3.     During this same period, iSqFt Sub also sought, but failed, to acquire Dodge. Thereafter, in response to their failure to capture the entire market through acquisition, defendants commenced a series of anticompetitive actions designed to drive Dodge out of the Nationwide CPI market and gain control of virtually 100% of the market for themselves.

4.     Specifically, Defendants launched a concentrated sales blitz against Dodge's customers, in which they offered many of those customers prices that were, in several instances, more than 80% below the price offered by Dodge. Indeed, the prices offered by defendants are so low that, upon information and belief, they are below defendants' average total cost and average variable cost, and constitute predatory pricing as a matter of law.

5.     But defendants' illegal and anticompetitive conduct did not consist of only predatory pricing. As part of their effort to destroy Dodge, Defendants have also engaged in a pattern of willful infringement of Dodge's valuable trademarks. Specifically, defendants have willfully infringed the registered United States trademark for Sweets Catalog, a publication owned by Dodge that has been the "go-to" product guide for architects for more than a century. Defendants have also willfully infringed Dodge's registered United States trademark for "Dodge BidPro" by offering a product – with similar functionality and aimed at the same customers – they call "Invitation to Bid Pro."

6.     Additionally, defendants forced their employees to sign illegal restrictive covenants prohibiting them from working for any entity that competes with any of the defendants' companies or divisions anywhere in the country without regard to customer- or geographic-specific limits. Defendants then threatened to enforce those covenants against both

current and former employees, as well as any company that attempted to hire them, including

Dodge.  All of these actions were designed to injure Dodge and drive Dodge from the

Nationwide CPI market.

7.     By this action, Dodge seeks, pursuant to Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15 and 26, treble damages and injunctive relief as a result of defendants' violation of

Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and violations of Sections 32(1) and

43(a) of the Lanham Act, 15 U.S. §§ 1114(1) and 1125.  Dodge also seeks damages and other

relief as a result of defendants' mark dilution under Ohio law, violation of Ohio's Deceptive

Trade Practices Act, trespass to chattels, and tortious interference with business relations.

Further, Dodge seeks a declaratory judgment that the restrictive covenants that defendants

require their employees to sign are unenforceable against the employees and Dodge.

## **PARTIES**

8.     Dodge is a limited liability company organized under the laws of Delaware with

its principal place of business in New York, New York.

9.     iSqFt is a corporation organized under the laws of Delaware with its principal

place of business in Cincinnati, Ohio.

10.    CMD is a limited liability company organized under the laws of Delaware with its

principal place of business in or near Atlanta, Georgia and/or Cincinnati, Ohio.

11.    CDC is a limited liability company organized under the laws of Delaware, with its

principal place of business in Florida and/or Cincinnati, Ohio.

12.    BidClerk is a corporation organized under the laws of Delaware with its principal

place of business in Chicago, Illinois and/or Cincinnati, Ohio.

13.     Defendant iSqFt Sub is a corporation organized under the laws of Delaware with its principal place of business in Cincinnati, Ohio.  iSqFt Sub was incorporated, upon information and belief, which will likely have substantial evidentiary support after a reasonable opportunity for discovery, to be a holding company for the other defendants, as well as Dodge if iSqFt were to successfully acquire Dodge.

14.     Defendants iSqFt and CMD have recently announced that they have "merged" or are intending to "merge," and thus they may be under common ownership or may be a single entity, or they may soon be under common ownership or may soon be a single entity. Defendants' announcements in this regard have been intentionally vague.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that it arises under the laws of the United States; pursuant to 28 U.S.C. § 1337, in that it arises under an Act of Congress protecting trade against restraints and monopolization; 28 U.S.C § 1138, in that it arises under an Act of Congress relating to trademarks; and 15 U.S.C. § 1121, in that it arises under the Lanham Act.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 2201, in that it seeks a declaratory judgment and there is a real and substantial controversy between parties with adverse legal interests.  This Court has supplemental jurisdiction over Dodge's state law claims under 28 U.S.C. § 1367(a), in that they are related to Dodge's claims arising under federal law and form part of the same case or controversy.

16.     This Court has general personal jurisdiction over defendant iSqFt Sub, in that iSqFt Sub's principal place of business is located in Ohio.  This Court also has specific personal

jurisdiction over defendant iSqFt Sub, in that the tortious acts complained of herein arise, and have caused injury, in Ohio.

17. This Court has general personal jurisdiction over defendant iSqFt, in that iSqFt's principal place of business is located in Ohio. This Court also has specific personal jurisdiction over defendant iSqFt, in that the tortious acts complained of herein arise, and have caused injury, in Ohio.

18. This Court has general personal jurisdiction over defendant CMD, in that either its principal place of business is located in Ohio or its actions are controlled by its corporate parent, which has its principal place of business located in Ohio. This Court also has specific personal jurisdiction over defendant CMD, in that the tortious acts complained of herein arise, and have caused injury, in Ohio.

19. This Court has general personal jurisdiction over defendant CDC, in that either its principal place of business is located in Ohio or its actions are controlled by its corporate parent, which has its principal place of business located in Ohio. This Court also has specific personal jurisdiction over defendant CDC, in that the tortious acts complained of herein arise, and have caused injury, in Ohio.

20. This Court has general personal jurisdiction over defendant BidClerk, in that either its principal place of business is located in Ohio or its actions are controlled by its corporate parent, which has its principal place of business located in Ohio. This Court also has specific personal jurisdiction over defendant BidClerk, in that the tortious acts complained of herein arise, and have caused injury, in Ohio.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), in that one or more of the defendants reside in this judicial district and all of the defendants are residents of Ohio.

## FACTS

### Overview of Dodge's Business

22.     Dodge is a provider in the United States and Canada of construction project information, building product information, construction plans and specifications, industry news, market research, and industry trends and forecasts ("Construction Project Information" or "CPI").  Dodge has been in the business of providing CPI for over one hundred years.

23.     In or about 1961, Dodge was acquired by McGraw Hill, and was operated as a division of McGraw Hill until late in 2014, when the assets representing the Dodge business were sold to their current owners.

24.     The CPI that Dodge provides to its customers comes largely from construction plans and specifications.  Plans provide a visual representation of the project, while the specifications set forth the project in textual form, and typically describe the products and materials that are to be used on the project with great specificity.  A typical specification will be 500 pages long, and can run significantly longer for larger, more complex projects such as a large office building or hotel.

25.     Dodge employs a nationwide network of individuals who have developed and continue to develop relationships with architects, project owners, and other construction industry professionals in order to obtain construction plans and specifications from them.  In the course of a typical year, Dodge will obtain approximately 160,000 plans and specifications from its

various sources.  Dodge has thousands of different sources, located all over the country, for its plans and specifications.

26.     After it has collected the plans and specifications from its network of sources, Dodge then reviews and processes the plans and specifications so that they can be presented to customers.  Originally, processing the plans and specifications was done completely manually, but over the years it has become a more automated process.  After the plans are processed, Dodge publishes the CPI to its customers.  For many years, this was done in the form of books that would summarize the plans and specifications in ways that would be useful to Dodge's customers.  Dodge's customers can now access the plans and specifications themselves, as well as a wealth of statistics and analytics concerning those plans, through web-based programs accessed by those customers who pay a subscription fee to Dodge.

27.     Given the labor intensive nature of both obtaining the plans and processing them for placement in Dodge's services, Dodge incurs considerable cost in developing, maintaining, and delivering its product to its customers.  The costs are both fixed and variable.  Some examples of variable costs include commissions, wages, bonuses, travel, training, marketing expenses, and server costs, among many others.

28.     Dodge's customers consist of any entity (such as building product manufacturers, distributors, general contractors, and subcontractors) that values information about upcoming construction projects on either a regional or national level.  Dodge offers its customers different products to choose from depending upon their needs.  For example, a general contractor located in Atlanta, Georgia might purchase a subscription from Dodge that would allow it to access plans, specifications, and other CPI only in Georgia or the Southeast.  The price of that

subscription would depend upon the level of detail and geographical area in which the contractor was interested, as well as the number of licenses purchased by the contractor.

29.     This case, however, principally concerns the market for one particular product, Nationwide CPI, which is the Dodge product that covers all areas of the United States and sometimes Canada.  Although some large contractors and architects purchase Nationwide CPI, for the most part, customers for Nationwide CPI consist of building product manufacturers ("BPMs") located in the United States and Canada.  BPMs are companies that make products used in the building industry, like glass, flooring, electrical systems, concrete, curtain wall, roofing material, and other products that are used to construct buildings.

30.     BPMs use Dodge's Nationwide CPI product for forecasting purposes, to generate sales leads, and to better understand how their particular product category is specified in plans and specifications, so that they can better market their products.  For example, a manufacturer of siding might access Dodge's network to determine how often its product is being specified across the country in order to better anticipate demand, or it might import the plans and specifications found in Dodge's network into its sales lead software in order to help its sales force secure sales, or it might use the Nationwide CPI in Dodge's network to better position its siding against its competitors.

31.     The Nationwide CPI provided by Dodge is very valuable to its customers, and subscriptions to Dodge's services can cost tens or even hundreds of thousands of dollars annually.  Dodge's customers for Nationwide CPI generally sign one- to three-year contracts, which expire and renew on the same annual calendar dates.

**The Defendants' Business**

32.     CMD has been Dodge's primary competitor in the market for Nationwide CPI since at least the early 2000s.  Upon information and belief, between 2000 and 2014, CMD was known as Reed Construction Data, and was a subsidiary or affiliate of Reed Elsevier plc ("Reed").

33.     By and large, CMD's business, including the process it uses to generate its CPI network, the way it provides access to that network to its customers, and the costs it incurs in doing both, is similar to Dodge's business as described above.  Like Dodge, CMD has an extensive network of employees or contractors who are responsible for obtaining specifications and plans from architects, project owners, and others in the industry.  And, like Dodge, it provides those plans and specifications to its customers through a web-based subscription service.  In addition, like Dodge, CMD maintains a specific portion of its sales force dedicated to pursuing BPMs and other entities interested in Nationwide CPI.  Indeed, as discussed more below, CMD (when it was known as Reed) entered this marketplace largely by recruiting employees from Dodge with the necessary experience and relationships with BPMs and having those employees steal confidential customer information from Dodge.

34.     iSqFt started out providing construction management software for construction managers, contractors, and subcontractors, but by 2014 had expanded into a full service provider of CPI with a very small presence in the market for Nationwide CPI.

35.     CDC, before its acquisition by iSqFt in 2015, was a small provider of regional CPI, based primarily in the East.  CDC also had a very small presence in the market for Nationwide CPI.

36.     BidClerk, before its acquisition by iSqFt in 2014, was primarily a provider of regional CPI with a limited presence in the market for Nationwide CPI.

37.     Even taken together, iSqFt, CDC, and BidClerk had only a minimal share of the market for Nationwide CPI.

**Previous Litigation Between the Parties' Predecessors**

38.     In 2009, CMD (then known as Reed) brought an action against Dodge (then a division of McGraw Hill) in the United States District Court for the Southern District of New York, alleging, among other things, that Dodge had improperly accessed CMD's databases by hiring phony companies to pose as CMD customers.  Those claims were, for the most part, dismissed.

39.     During the course of that litigation (the "2009 Litigation"), however, Dodge discovered that CMD had hired numerous former employees of Dodge who – before leaving their employment with Dodge – had, at the urging of and in concert with CMD, surreptitiously taken highly confidential information from Dodge.  These employees then turned over all of that purloined information to executives of CMD, who then knowingly used it to compete against Dodge in the Nationwide CPI market.

40.     Specifically, among other things, Dodge discovered that two of its former sales directors, Dean Paulson and Craig Fuss, before assuming top sales executive positions with CMD, stole highly prized and closely guarded detailed customer information representing more than $120 million in Dodge's business.  The information included details regarding the products purchased, the customers' identities, the precise dollar amounts spent by those customers, and the date on which the customers' contracts expired (the "Stolen Customer Information").  The

two men then revealed much, if not all, of the Stolen Customer Information to CMD's sales force.

41.     Dodge retains its customers for many years.  As a result, the Stolen Customer Information also retains its relevance and usefulness for many years as well.  The Stolen Customer Information gives CMD critical "inside information" about who Dodge's customers are, what products they purchase, the date on which their contracts expire, and (at a minimum) how much they are willing to pay for those products.  All of this information is a useful tool in CMD's efforts to target Dodge's business.

42.     Dodge brought a counterclaim against CMD in the 2009 Litigation, which McGraw Hill – Dodge's former owner – retained when selling Dodge to its current owners.  After the sale of Dodge, McGraw Hill agreed to the dismissal of these claims, and CMD's blatant theft of trade secrets is not in issue in the present litigation.  As explained below, however, CMD's use of that confidential information is a part of defendants' anticompetitive campaign designed to drive Dodge from the marketplace.

## ANTICOMPETITIVE CONDUCT

43.     Due to significant barriers to entry, for most of the last one hundred years, the market for Nationwide CPI has been a one- or two-player market.  However, starting several years ago, several smaller competitors offering inferior products began to emerge.  None of these competitors, however, was successful in obtaining more than a de minimis share of the relevant market for Nationwide CPI.

44.     One such competitor was BidClerk.  Beginning in or around 2012, BidClerk made a deliberate effort to increase its penetration of the market for Nationwide CPI.  BidClerk used the same approach that CMD had taken several years earlier:  it lured away from CMD the same

two former employees of Dodge – Dean Paulson and Craig Fuss – who had taken the Stolen

Customer Information. Even with the aid of these two employees, however, by 2014 BidClerk

had only established itself as a limited participant in the Nationwide CPI market, with a product

that was significantly inferior to the products offered by Dodge and CMD.

45.    Unlike the products offered by Dodge and CMD, BidClerk's product was derived

largely from publicly available sources that it could electronically "scrape" for information,

instead of from a nationwide network of both public and private sources developed through years

of effort and personal relationships. Consequently, the scope of its product was less complete

and the information contained therein was less up-to-date than the products offered by Dodge

and CMD. BidClerk thus appealed primarily to customers that were looking for a cheaper, but

less useful, alternative to Dodge and CMD.

46.    CDC was mostly a regional player, focusing on the eastern half of the United

States. By 2014, it too had become a very small player in the relevant market for Nationwide

CPI with a product similar to BidClerk's, but with scope and coverage inferior even to

BidClerk's.

**ISqFt Builds Market Power Through Acquisitions**

47.    Beginning in 2014, iSqFt Sub and its affiliates engaged in an attempt to

monopolize the market for Nationwide CPI by seeking to acquire each of the competitors in that

marketplace. Thus, in or about October 2014, iSqFt Sub acquired both iSqFt and BidClerk,

including Dean Paulson and Craig Fuss and the Stolen Customer Information. Thereafter, in

April 2015, iSqFt acquired CDC.

48.    Finally, in August 2015, the combined entity (which continued under the iSqFt

name) announced its intention to "merge" with CMD, Dodge's chief rival for Nationwide CPI

customers. The announcement of the "merger" did not state when the "merger" would close, what form the "merger" would take, or whether iSqFt and CMD would end up forming a single entity.

49.     iSqFt Sub also attempted a merger with or acquisition of Dodge, which would have had the effect of creating a 100% monopoly in the Nationwide CPI market. iSqFt Sub, however, was unable to acquire Dodge.

50.     The end result of the foregoing transactions is a marketplace that consists of two competitors for Nationwide CPI customers: Dodge and the combined iSqFt/CMD/BidClerk/CDC entity (referred to herein as "iSqFt/CMD"). As CMD stated in its complaint against Dodge in the 2009 Litigation: "[CMD] only has one primary competitor for its national accounts: Dodge."

**The Market for Nationwide Construction Project
Information in the United States and Canada is a Discernible
Product and Geographic Market for Antitrust Purposes**

51.     The market for Nationwide CPI in the United States and Canada is a discernible and definitive product and geographic market.

52.     There are no available substitute products for Nationwide CPI provided by Dodge and iSqFt/CMD. There is no product that provides customers with detailed, comprehensive, and up-to-date information about upcoming and planned projects other than the products offered. There is no product with a high cross-elasticity of demand with Nationwide CPI.

53.     There are a number of smaller companies that offer CPI on a regional or local level, but these products are not reasonable substitutes for, or reasonably interchangeable with, the products offered by Dodge and iSqFt/CMD. These products offer much less information

than the nationwide products offered by Dodge and iSqFt/CMD, and they cover only a portion of the geographic area covered by Nationwide CPI.

54.     In addition, the quality of the regional and local products – both in terms of the interface available for searching and interacting with the data, as well as the breadth of construction projects included – is significantly less in terms of scope, coverage, and quality.

55.     It is not possible for a customer to cobble together the same quality and quantity of information contained in the Nationwide CPI products by contracting with the regional or local providers because the breadth, quality, timeliness and reach of the data provided by these companies is nowhere near the same as that provided by Dodge and iSqFt/CMD.  As a result, no matter what price is offered by these local and regional providers of CPI, they are unable to lure a meaningful amount of Nationwide CPI customers from Dodge or iSqFt/CMD.

56.     There are significant barriers to entry into this market.  To effectively compete, a firm must have access to nationwide information about upcoming and planned construction projects.  This can only be done by developing, usually over the course of many years, a network of individuals with sufficient relationships with architects, project owners, and other construction professionals to secure the necessary plans and specifications.  Further, a firm would need to have a salesforce with ties throughout the United States and Canada to BPMs interested in purchasing CPI.  Finally, a firm entering this market would need to develop a software solution that permitted end users to sort through and effectively use millions of pages of information.

57.     In the past 100 years, no company other than Dodge or CMD has occupied this market, other than in a de minimis way, and CMD did so, in part, by poaching sales employees and confidential information from Dodge.  The relevant market for Nationwide CPI has remained – as CMD itself admitted in the previous litigation – a one or two competitor market.

14

This fact alone demonstrates that the barriers to entry in this market are significant and difficult to overcome.

**iSqFt/CMD Has Sufficient Market Power to Provide its Attempt**
**to Monopolize the Market with a Dangerous Probability of Success**

58.     Upon information and belief, which will likely have substantial evidentiary support after a reasonable opportunity for discovery, Dodge and iSqFt/CMD have approximately equal 50% shares in the United States and Canada of the market for Nationwide CPI.

59.     iSqFt/CMD has sufficient market power that, if Dodge were driven from the market and iSqFt/CMD were the single remaining firm in the market, there would be a dangerous probability that iSqFt/CMD would charge supra-competitive prices to its customers. Further, since the barriers to entry into the Nationwide CPI market are virtually insurmountable, such supra-competitive pricing would be unchallenged by new entrants into the market.  Thus, iSqFt/CMD would more than recoup any losses it incurred in attaining market power.

**iSqFt/CMD's Predatory Pricing Aimed at Dodge's Customers**

60.     Late in 2013 or in early 2014, the then president of CMD (then known as Reed) implored his sales staff to do "whatever it takes to disrupt Dodge's business."  Thereafter, among other anti-competitive acts described below, CMD (and now iSqFt/CMD), armed with the Stolen Customer Information that it had taken from Dodge, engaged – and continues to engage – in a concentrated sales blitz, in which it has specifically targeted Dodge's customers and offered to them unsustainably below cost, predatory prices in order to ensure that those customers switch to CMD, all with the specific intent and purpose of driving Dodge out of the Nationwide CPI market and then recouping its losses by charging supra-competitive prices.

61.     Specifically, among other things, CMD provided its two leading field sales people with a list of 50 to 70 Dodge customers and instructed those sales people to concentrate full time on converting those customers to CMD.  In addition to commissions on each sale, both of these employees were provided with bonuses that could equal $100,000 a year, depending on their success in converting Dodge's customers.  Thus, these sales people were highly motivated to take Dodge's accounts at any price, including a price below CMD's average total cost and average variable cost.

62.     In addition, CMD's inside sales force specifically targeted the Dodge customers that were not allocated to the two salespersons mentioned above with a mandate to convert Dodge's customers no matter what the price.  Indeed, the top management of iSqFt/CMD not only specifically approved sales that were well below average total cost and average variable cost, but actually sent companywide e-mails touting "another Dodge takeaway" whenever iSqFt/CMD successfully converted Dodge's customers to iSqFt/CMD, regardless of the price at which the Dodge customer was taken.

63.     The end result of the bonus structure and management's sanctioning of below-cost sales was that iSqFt/CMD offered customers prices that, in some instances, were more than 80 percent less than the price offered by Dodge.  A small sample of the pricing offered to Dodge's customers is set forth in the chart below.  In each of these instances, CMD made the sale and captured Dodge's customer:

| __Account__ | __Month Lost__ | __Dodge's Price__ | __CMD's Price__ | __Percentage Reduction from Dodge's Price__ |
|---|---|---|---|---|
| **Customer A** | 12/2014 | $530,976 | $180,000 | 66.1% |
| **Customer B** | 12/2014 | $324,611 | $45,000 | 86.0% |
| **Customer C** | 12/2014 | $122,943 | $20,000 | 83.7% |

16

| | | | | |
|---|---|---|---|---|
| **Customer D** | 1/2015 | $33,000 | $12,000 | 63.6% |
| **Customer E** | 3/2015 | $32,000 | $12,000 | 62.5% |
| **Customer F** | 05/2015 | $49,706 | $25,000 | 49.7% |
| **Customer G** | 08/2015 | $175,180 | $29,000 | 83.4% |
| **Customer H** | 08/2015 | $105,570 | $50,000 | 52.6% |
| **Customer I** | 12/2015 | $76,365 | $45,810 | 40.0% |

The chart above shows only a few examples of pricing by iSqFt/CMD that is believed to be below iSqFt/CMD's average total cost and average variable cost, and there are many additional examples that are not represented above. [1] Dodge could not have made any of these sales (as well as numerous other sales made by iSqFt/CMD that are not listed) at the price offered by iSqFt/CMD at a profitable level – i.e., without pricing below its costs – and, upon information and belief, neither could have iSqFt/CMD.

64.    Upon information and belief, which will likely have substantial evidentiary support after a reasonable opportunity for discovery, the prices offered by iSqFt/CMD to Dodge's customers are far less than the prices offered to its own customers and far less than its variable and total costs.

65.    Dodge estimates that since November 2014, it has lost customers with millions of dollars in annual sales volume as a result of iSqFt/CMD's predatory pricing tactics. In addition, Dodge has lost at least a million dollars more in "price erosion," where it was forced to discount

---

[1] Dodge has withheld the identity of each of the customers in the chart in order to preserve their confidentiality at this stage of the litigation. The identities of each of the customers set forth in the chart will be provided once a suitable protective order has been entered.

to unsustainable, unprofitable (i.e., below its costs) levels in order to retain a customer in response to CMD's predatory pricing.

66.     Information about iSqFt/CMD's actual cost structure is within the sole possession of iSqFt/CMD.  However, upon information and belief, which will likely have substantial evidentiary support after a reasonable opportunity for discovery, and other information about iSqFt/CMD's costs (including publicly available information and a comparison to Dodge's own cost structure, which should be substantially similar to iSqFt/CMD's cost structure), the prices offered by iSqFt/CMD to the customers outlined above, as well as numerous other customers, are so low that they are below defendants' average total cost and average variable cost, and thus constitute predatory pricing as a matter of law.

**iSqFt/CMD's Scheme Has a Dangerous**
**Probability of Injuring Competition**

67.     iSqFt/CMD's scheme – to engage in predatory pricing and other anticompetitive conduct with the specific intent to drive Dodge out of the market or to force it to agree to a merger with iSqFt/CMD – has a dangerous probability of creating a monopoly and injuring competition.  Indeed, Dodge and iSqFt/CMD are the only two firms in the Nationwide CPI market.  Once Dodge was out of the market, there would be a dangerous probability that iSqFt/CMD would raise prices to supra-competitive levels in order to recoup its losses and more. Indeed, because under these circumstances absolutely no alternative to iSqFt/CMD would exist, iSqFt/CMD would control 100% of the Nationwide CPI market, which would result in consumers being charged supra-competitive prices.

68.     Without Dodge in the market, not only would there be a dangerous probability that prices to consumers of Nationwide CPI would rise to supra-competitive levels, but there is also a dangerous probability that competition, in the form of product quality and innovation, in

18

the Nationwide CPI market would be destroyed. Heated competition between Dodge and CMD

(and now iSqFt/CMD) has over the years required each firm, in order to keep up with, or to gain

some edge over, its rival, to improve the quality of its products by, among other things,

increasing the scope of the construction projects it covers and improving the customers' ability to

access information through automation, software enhancements, and other electronic tools.

Dodge and iSqFt/CMD have over the years invested substantial amounts of money in improving

the scope, depth, timeliness of the information available in their networks, and the digital

platform and search tools available to their customers. If iSqFt/CMD is successful in its attempt

to drive Dodge out of the Nationwide CPI market, there will be no further incentive for

iSqFt/CMD to continue to improve the quality of its product, and competition in the market for

Nationwide CPI will be severely damaged.

## **TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**

69.     In addition to the attempt to acquire all of the participants in the market for

Nationwide CPI and the predatory pricing described above, iSqFt/CMD also attempted to restrict

competition and monopolize the relevant market by infringing or otherwise diluting Dodge's

trademarks and by forcing its employees to enter into illegal restrictive covenants, both as

described below.

### **Infringement of the Sweets Mark**

70.     In addition to its production and sale of CPI, Dodge is the publisher of Sweets™

Catalog ("Sweets"). Sweets is a product catalog for the construction industry. It features

thousands upon thousands of products, all of which have been carefully indexed. Thus, for

example, if an architect wished to specify window treatments, he or she could go to the specific

section within Sweets dealing with window treatments, and he or she would find pages dedicated

19

to window treatments that are available to be specified, along with sufficient product details to ensure that they were specified correctly.

71.     Dodge has published Sweets since 1906.  Over the years, it became the essential product catalog for architects such that when it was still published in physical form, it could be found in the office of nearly every architect in the country.  Upon information and belief, Sweets is such an important part of architectural practice that virtually every architect in the country is at least aware of Sweets, and most architects continue to use it in their business.

72.     Sweets charges product manufacturers a fee to appear in the publication, and the manufacturers view their appearance in Sweets as an important and effective form of advertising for their products.  Dodge published the Sweets catalog in physical form until 2012, and continues to publish it online today.

73.     Since at least the early 1940s, Dodge has used a distinctive trademark, consisting of a white "S" inside a solid circle, as shown in the image below:



74.     Dodge owns three United States Trademarks for this symbol, including federal trademark Registration No. 0515448, first registered in September 1949 (and first used in interstate commerce on February 3, 1943) ; No. 0686067, first registered in September 1959 (and first used in interstate commerce on February 3, 1943); and No. 1662042, first registered in October 1991 (and first used in interstate commerce on January 1, 1989) (collectively, the "Sweets Registered Marks").  (The Registration Certificates for the Sweets Registered Marks are attached hereto as Exhibit A).  Since their Registration, Dodge has continuously used all of the

Sweets Registered Marks in interstate commerce. All of the Sweets Registered Marks are valid, subsisting, and in full force and effect.

75. For many years, Sweets has been published in a distinctive green color, with the white stylized "S" logo inside a green background, as shown in the photograph below:



76. Dodge continues to use essentially the same green color and the stylized "S" logo today in its online version of Sweets, as shown in the screen shot below:



77. As a result of more than seventy years of widespread use, and the enormous good will that Sweets has developed in more than a century of publication, consumers of architectural

product catalogs associate the stylized "S" logo and the distinctive green color with Dodge and its Sweets publication. Dodge has common law trademark rights in the stylized "S" logo in any color, as well as the stylized "S" logo used with the distinctive green color.

78. Recently, however, defendant CDC has begun to use a mark that is strikingly similar to the Sweets mark for the purpose of selling advertising in a product that competes directly with Dodge's Sweets publication.

79. In particular, as shown below, CDC has begun using a mark that simply takes the "S" element in the Sweets Registered Mark used by Sweets and changes it to a dollar sign by adding "tabs" to the top and bottom of the same stylized "S" used by Sweets since 1943 (the "Offending 'S' Mark"):



80. CDC's use of the Offending "S" Mark shown above is unfair, confusing, and misleading. The confusion caused by the Offending "S" Mark is compounded because CDC uses a color that is extraordinarily similar to the green that consumers have long associated with Sweets. CDC is unfairly trading upon and appropriating the reputation and goodwill of Sweets for its own commercial gain

81. Further, CDC's use of the Offending "S" Mark is likely to cause – and has actually caused – the public to believe that CDC is associated or affiliated with Sweets or that its products are endorsed by Sweets.

22

**Infringement of the Dodge BidPro Mark**

82.     Since in or about January 2012, Dodge has offered a product known as "Dodge

BidPro™" ("BidPro").  BidPro is a software application and website service aimed at local and

regional subcontractors.  BidPro delivers construction news and leads directly to subcontractors,

either on their desktops or through a mobile device.

83.     Dodge advertises BidPro on its website and elsewhere, as shown below:



84.     Dodge owns United States trademark registration No. 4,243,334 for the mark

Dodge BidPro, which was first registered on November 12, 2012 (and first used in interstate

commerce on January 17, 2012 (the "BidPro Registered Mark").  (The Registration Certificate

for the BidPro Registered Mark is attached hereto as Exhibit B).  Since its Registration, Dodge

has continuously used the BidPro Registered Mark in interstate commerce.  The BidPro

Registered Mark is valid, subsisting, and in full force and effect.

85.     BidPro is a very successful product for Dodge, and consumers associate "Dodge BidPro" and "BidPro" with Dodge. Dodge has common law trademark rights in the marks "Dodge BidPro" and "BidPro."

86.     Recently, however, defendant CDC has begun to use a mark that is confusingly similar to the BidPro Registered Mark for the purpose of selling a product that directly competes with BidPro.

87.     In particular, as shown below, CDC has begun offering for sale a product that it has labeled "Invitation to Bid Pro" (the "Offending Invitation to Bid Pro Mark"):



88.     CDC's first use of the Offending Invitation to Bid Pro Mark occurred long after Dodge's first use of the BidPro Mark.

89.     CDC's use of "Bid Pro" to promote a product that directly competes with BidPro is clearly confusing to consumers. Further, the structure of CDC's mark – in which the phrase "invitation to" precedes the use of "Bid Pro" – leaves the impression that the reader is being

invited to use Dodge's product, when in fact the link on CDC's website takes the reader to CDC's product and it is CDC's product that is being advertised.

90.     CDC's use of the Offending Invitation to Bid Pro Mark is unfair, confusing, and misleading.  CDC is unfairly trading upon and appropriating the reputation and goodwill of Dodge for its own commercial gain.  Indeed, Dodge has been specifically informed of at least one customer that has been confused and mislea by CDC's use of the Offending Invitation to Bid Pro Mark.

91.     Further, CDC's use of the Offending Invitation to Bid Pro Mark is likely to cause – and has actually caused – the public to believe that its products are endorsed by Dodge.

## iSFt/CMD'S ILLEGAL RESTRICTIVE COVENANTS

92.     In addition to the conduct outlined above, iSqFt/CMD has attempted to restrict competition in the Nationwide CPI market by requiring its employees to sign overly broad and illegal restrictive covenants.  Among other things, these restrictive covenants prohibit employees, for a period of one year following termination for any reason, from engaging in any activity that competes with iSqFt/CMD anywhere in the country and also prohibit employees, for a period of one year, from soliciting any customer of iSqFt/CMD anywhere in the country.  Thus, for example, an employee who called on customers in the Pacific Northwest would be prohibited from taking a position in the Southeast, even though that position would not entail calling on any of the same customers or using any of iSqFt/CMD's customer information.

93.     Upon information and belief, which will likely have substantial evidentiary support after a reasonable opportunity for discovery, employees of iSqFt/CMD are required to enter into these illegal covenants even though they are at-will employees of iSqFt/CMD and receive no consideration whatsoever in exchange for their agreement to these illegal covenants,

25

and even though iSqFt/CMD has no legitimate protectable interest in such an indiscriminately broad restriction.

94.     iSqFt/CMD then attempts to enforce these illegal covenants by having its attorneys contact any company that seeks to hire these employees and threaten that company so that it will not hire that employee.  This has the effect of reducing the pool of available and experienced sales personnel for Nationwide CPI, thereby reducing competition in the Relevant Market.

95.     For example, in or around August 2015, Dodge attempted to hire a former employee of iSqFt/CMD.  Dodge specifically intended to hire that individual to cover a geographic area that was different from, and did not overlap at all with, the geographic area for which he was responsible while at iSqFt/CMD.  Indeed, none of the customers or potential customers that the individual would have called upon would have been customers with whom he had prior contact.  Nevertheless, shortly after Dodge entered into discussions with this individual, iSqFt/CMD authorized its attorneys to deliver a letter to Dodge, in which iSqFt/CMD made it clear that it would attempt to enforce the restrictive covenants contained in its employee's contracts.  (See Letter attached hereto as Exhibit C).

96.     Dodge would have hired this individual, but chose not to due to the uncertainty created by the restrictive covenants and the obvious threat of litigation contained in Exhibit C.

**FIRST CLAIM FOR RELIEF**
**(Attempt to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

97.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 96 above as if fully set forth herein.

98.     This claim arises under the antitrust laws of the United States, particularly the Sherman Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. § 15.

99.     The market for Nationwide CPI in the United States and Canada is a discernable and definitive product and geographic market (the "Relevant Market"). There are no available reasonably interchangeable products, nor are there any products with a high cross-elasticity of demand with Nationwide CPI. The barriers to entry in this market are extremely high.

100.    Defendants had and continue to have the specific intent to destroy competition in the Relevant Market, which intent can be inferred from their anticompetitive conduct.

101.    Defendants have engaged in anticompetitive conduct in furtherance of their attempt to monopolize, including, among other things, attempting to acquire monopoly power by acquiring every competitor in the marketplace; engaging in predatory pricing that is, upon information and belief, below their average total cost and average variable cost; using confidential, trade-secret information about plaintiff's customers, including details regarding the products purchased, the customers' identities, the precise dollar amounts spent by those customers, and the date on which the customers' contracts expired, to tortiously interfere with the business relationships between plaintiff and its customers; intentionally and willfully infringing plaintiff's trademarks; and restricting competition by requiring their employees to sign illegal restrictive covenants and then threatening any company that seeks to hire these employees.

102.    There is no legitimate business reason for defendants' anticompetitive conduct.

103.    Defendants, by virtue of their market share in the Relevant Market (approximately 50%) and the lack of any alternative supplier for Nationwide CPI other than plaintiff, possess or are likely to possess market power in the Relevant Market.

104. Defendants have a dangerous probability of successfully monopolizing the Relevant Market by driving plaintiff from the Relevant Market.

105. Defendants' conduct has caused, and unless enjoined, will continue to cause, injury to competition in the Relevant Market, including interstate commerce.

106. As a direct and proximate cause of defendants' conduct, Dodge has suffered and will continue to suffer antitrust injury to its business and property as a result of the illegal actions of the defendants.

## SECOND CLAIM FOR RELIEF
## (Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

107. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 106 above as if fully set forth herein.

108. This claim arises under the antitrust laws of the United States, particularly the Sherman Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. § 15.

109. Defendants, with specific intent, conspired and agreed to monopolize the Relevant Market.

110. At the time of this agreement or conspiracy, defendants were independent entities such that their agreement deprived the marketplace of independent centers of decision making.

111. Defendants took numerous overt acts in furtherance of the agreement or conspiracy, including, but not limited to, the attempt to acquire each of the competitors in the market; each act of predatory pricing and tortious interference with Dodge's customers; each act of infringement of Dodge's trademarks; and each time it required its employees to sign illegal restrictive covenants.

112.    Defendants' conduct has caused, and unless enjoined, will continue to cause, injury to competition in the Relevant Market, including interstate commerce.

113.    As a direct and proximate cause of defendants' conduct, Dodge has suffered and will continue to suffer antitrust injury to its business and property as a result of the illegal actions of the defendants.

**THIRD CLAIM FOR RELIEF**
**(Conspiracy in Restraint of Trade in Violation**
**<u>of Section 1 of the Sherman Act, 15 U.S.C. § 1</u>)**

114.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 113 above as if fully set forth herein.

115.    Defendants, through the concerted, anticompetitive actions described above, including merging or combining with each other, attempting to acquire all of the competitors in the market, predatory pricing, trademark infringement, tortious interference with Dodge's contracts, and threating to enforce invalid restrictive covenants, have conspired or combined to eliminate Dodge as a competitor through unfair business practices and to unreasonably restrain trade in the Relevant Market, including interstate commerce.

116.    At the time of these combinations and conspiracies, defendants were independent entities such that their agreement deprived the marketplace of independent centers of decision making.

117.    The conduct of defendants described above constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and unreasonably restrains trade by, among other things, reducing the number of competitors in the Relevant Market, which will reduce output and innovation, increase prices, and decrease quality in the Relevant Market.

118.     Defendants' conduct has caused, and unless enjoined, will continue to cause, injury to competition in the Relevant Market.

119.     As a direct and proximate cause of defendants' conduct, Dodge has suffered and will continue to suffer antitrust injury to its business and property as a result of the illegal actions of the defendants.

## FOURTH CLAIM FOR RELIEF
### (Trademark Infringement of the "S" (Sweets) Mark, 15 U.S.C. § 1114(1))

120.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 119 above as if fully set forth herein.

121.     Plaintiff is the owner of the Sweets Registered Marks, all of which are valid, subsisting, and in full force and effect.

122.     Defendants' use of the Offending "S" Mark is likely to cause confusion, mistake, or deception as to the source, affiliation, sponsorship, or authenticity of defendants' goods and services.

123.     As a result of defendants' unauthorized use of marks that are identical or confusingly similar to the Sweets Registered Marks, the public is likely to believe that defendants' goods and services have been approved by, or are affiliated with, plaintiff.

124.     Defendants' infringement of the Sweets Registered Marks is willful, intended to reap the benefit of plaintiff's goodwill, and violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

125.     As a result of defendants' wrongful conduct, plaintiff has suffered, and will continue to suffer, substantial damages.

126.     This is an exceptional case and plaintiff is entitled to an award of attorneys' fees.

127. Unless defendants' infringing conduct is enjoined, plaintiff will continue to suffer irreparable harm.

## FIFTH CLAIM FOR RELIEF
### (Federal Unfair Competition Concerning the "S" (Sweets) Mark, 15 U.S.C. § 1125(a))

128. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 127 above as if fully set forth herein.

129. Defendants' distribution, marketing, promotion, offering for sale, and sale of goods bearing the Offending "S" Mark constitutes false designation of origin and false descriptions or representations that defendants' websites, services, and products originate from or are authorized by plaintiff.

130. As a result of defendants' use of the Offending "S" Mark and use of a similar green color, the public is likely to be misled and confused as to the source, sponsorship, or affiliation of defendants' website, services, and products.

131. Defendants' conduct is willful, intended to reap the benefits of plaintiff's goodwill, and violates section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

132. As a result of defendants' wrongful conduct, plaintiff has suffered and will continue to suffer damages.

133. This is an exceptional case and plaintiff is entitled to an award of attorneys' fees.

134. Unless defendants' infringing conduct is enjoined, plaintiff will continue to suffer irreparable harm.

## SIXTH CLAIM FOR RELIEF
### (Dilution of the Sweets Mark Under Ohio Law)

135. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 134 above as if fully set forth herein.

31

136.     Defendants' use of the Offending "S" Mark operates to whittle away and disperse the value of plaintiff's marks in the minds of the public.

137.     Plaintiff's marks, including the Sweets Registered Marks, are famous, strong, and distinctive to consumers of construction product catalogs and to the advertisers in such catalogs.

138.     Defendants' use of the Offending "S" Mark dilutes the strength of plaintiff's mark by blurring and diminishing the goodwill plaintiff has developed over more than seventy years.

139.     Defendants' infringing conduct is willful and this is an exceptional case.  Plaintiff is entitled to an award of attorneys' fees.

140.     Unless defendants' infringing conduct is enjoined, plaintiff will continue to suffer irreparable harm.

## SEVENTH CLAIM FOR RELIEF
### (Violation of the Ohio Deceptive Trade Practices Act Relating to the "S" (Sweets) Mark)

141.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 140 as if fully set forth herein.

142.     Plaintiff's marks, including the Sweets Registered Marks, are a "mark," "service mark," "trademark" or "trade name" pursuant to R.C. § 4165.01 (C), (E), (F), and (G).

143.     Defendants are "persons" within the meaning of R.C. § 4615.01(D).

144.     Defendants' use of the Offending "S" Mark causes a likelihood of confusion among the public as to the source, sponsorship, approval, or certification of defendants' goods or services.

145.     Defendants' use of the Offending "S" Mark is a deceptive representation as to the source or origin of defendants' goods and services.

146.    Defendants' use of the Offending "S" Mark causes a likelihood of confusion or misunderstanding among the public as to affiliation, connection, or association with, or certification by, plaintiff.

147.    As a result of the actions of defendants, plaintiff has been, and continues to be, damaged.  Defendants' actions are willful and plaintiff is entitled to an award of attorneys' fees.

148.    Unless defendants' infringing conduct is enjoined, plaintiff will continue to suffer irreparable harm.

**EIGHTH CLAIM FOR RELIEF**
**(Trademark Infringement of the BidPro Mark, 15 U.S.C. § 1114(1))**

149.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 148 above as if fully set forth herein.

150.    Plaintiff is the owner of the BidPro Registered Mark, which is valid, subsisting, and in full force and effect.

151.    Defendants' use of the Offending Invitation to Bid Pro Mark is likely to cause confusion, mistake, or deception as to the source, affiliation, sponsorship, or authenticity of defendants' goods and services.

152.    As a result of defendants' unauthorized use of marks that are identical and/or confusingly similar to the BidPro Registered Mark, the public is likely to believe that defendants' goods and services have been approved by, or are affiliated with, plaintiff.

153.    Defendants' infringement of the BidPro Registered Mark is willful, intended to reap the benefit of plaintiff's goodwill, and violates Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

154.    As a result of defendants' wrongful conduct, plaintiff has suffered, and will continue to suffer, substantial damages.

155.     This is an exceptional case and plaintiff is entitled to an award of attorneys' fees.

156.     Unless defendants' infringing conduct is enjoined, plaintiff will continue to suffer irreparable harm.

### NINTH CLAIM FOR RELIEF
### (Federal Unfair Competition Concerning the BidPro Mark, 15 U.S.C. § 1125(a))

157.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 156 above as if fully set forth herein.

158.     Defendants' distribution, marketing, promotion, offering for sale, and sale of goods bearing the Offending Invitation to Bid Pro Mark constitutes false designation of origin and false descriptions or representations that defendants' website, services, and products originate from or are authorized by plaintiff.

159.     As a result of defendants' use of the Offending Invitation to Bid Pro Mark, the public is likely to be misled and confused as to the source, sponsorship, or affiliation of defendants' website, services, and products.

160.     Defendants' conduct is willful, intended to reap the benefits of plaintiff's goodwill, and violates section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

161.     As a result of defendants' wrongful conduct, plaintiff has suffered and will continue to suffer damages.

162.     This is an exceptional case and plaintiff is entitled to an award of attorneys' fees.

163.     Unless defendants' infringing conduct is enjoined, plaintiff will continue to suffer irreparable harm.

**TENTH CLAIM FOR RELIEF**
**(Violation of the Deceptive Trade Practices Act Relating to the BidPro Mark)**

164.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 163 above as if fully set forth herein.

165.    Plaintiff's marks, including the BidPro Registered Mark, are a "mark," "service mark," "trademark" or "trade name" pursuant to R.C. § 4165.01 (C), (E), (F), and (G).

166.    Defendants are "persons" within the meaning of R.C. § 4615.01(D).

167.    Defendants' use of the Offending Invitation to Bid Pro Mark causes a likelihood of confusion among the public as to the source, sponsorship, approval, or certification of defendants' goods or services.

168.    Defendants' use of the Offending Invitation to Bid Pro Mark is a deceptive representation as to the source or origin of defendants' goods and services.

169.    Defendants' use of the Offending Invitation to Bid Pro Mark causes a likelihood of confusion or misunderstanding among the public as to affiliation, connection, or association with, or certification by, plaintiff.

170.    As a result of the actions of defendants, plaintiff has been, and continues to be, damaged.

171.    Defendants' infringing conduct is exceptional, and entitles plaintiff to an award of attorneys' fees.  Defendants' actions are willful and plaintiff is entitled to an award of attorneys' fees.

172.    Unless defendants' infringing conduct is enjoined, plaintiff will continue to suffer irreparable harm.

## ELEVENTH CLAIM FOR RELIEF
### (Tortious Interference with Prospective Business Relationships)

173.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 172 above as if fully set forth herein.

174.    Plaintiff had business relationships with its customers to provide Nationwide CPI.

175.    Defendants knew that plaintiff had such business relationships.

176.    Defendants, upon information and belief, acting solely out of malice, or using dishonest, unfair, and improper means, intentionally interfered with plaintiff's business relationships with its customers, by, among other things, using Stolen Customer Information and pricing below its costs to target those customers.

177.    As a result of defendants' interference, many of plaintiff's customers have refused to renew their contracts with plaintiff.

178.    Plaintiff was damaged and will continue to be damaged by defendants' tortious interference.

## TWELFTH CLAIM FOR RELIEF
### (Trespass to Chattels)

179.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 178 above as if fully set forth herein.

180.    Plaintiff has a personal property interest in the Stolen Customer Information.

181.    Defendants have physically interfered with the use of that customer information by stealing it without excuse and using it to target plaintiff's customers.

182.    There is no justification or consent for defendants' use of the Stolen Customer Information.

36

183.    Each use of the Stolen Customer Information constitutes a new trespass and interference with plaintiff's rights.

184.    Defendants' use of the Stolen Customer Information harms the condition, quality, and material value of the customer information.

185.    Plaintiff has been damaged by defendants' trespass and use of the Stolen Customer Information.

**THIRTEENTH CLAIM FOR RELIEF**
**(Declaratory Judgment)**

186.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 185 above as if fully set forth herein.

187.    Defendants claim that the restrictive covenants that they force their employees to sign are valid and that plaintiff cannot hire any of their current or former employees who have signed such restrictive covenants.

188.    Plaintiff claims that the restrictive covenants signed by defendants' employees are invalid and that plaintiff can hire such employees.  Plaintiff has not hired any such employees due to the uncertainty created by the restrictive covenants and the threat of litigation thereon.

189.    There is a justiciable controversy between parties with adverse legal interests over whether the restrictive covenants are legal and enforceable and, thus, whether they preclude Dodge from hiring employees and former employees of defendants.

190.    Plaintiff has a legal interest in the enforceability of the restrictive covenants because it has been threatened with legal action should it hire an individual who is a signatory to such a covenant.  A declaratory judgment as to the enforceability of the restrictive covenants would thus resolve a matter in controversy between the parties.

191.    Plaintiff is entitled to a declaratory judgment holding that the restrictive covenants are invalid.

**WHEREFORE**, plaintiff demands judgment as follows:

(a)    on the First, Second, Third, Fourth, Fifth, Eighth, and Ninth Claims for relief, awarding treble damages and in an amount to be determined at trial, together with interest;

(b)    on the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Claims for relief, awarding attorneys' fees pursuant to statute (15 U.S.C. § 15(a), 15 U.S.C. § 1117, and R.C. § 4165.03).

(c)    on the Sixth, Seventh, Tenth, Eleventh, and Twelfth Claims for Relief, awarding damages against defendants in an amount to be determined at trial, together with interest;

(d)    on the Thirteenth Claim for Relief, declaring that defendants' restrictive covenants are invalid and illegal;

(e)    permanently enjoining defendants from further violation of the antitrust laws, further infringement and dilution of plaintiff's marks, and further use of the Stolen Customer Information;

(f)    awarding to Dodge attorneys' fees and all other costs of this action; and

(g)    awarding such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands trial by jury in this action of all issues so triable.

Dated:    Cincinnati, Ohio
        September 28, 2016

        Respectfully submitted,

        /s/ Russell S. Sayre
        Russell S. Sayre (0047125)
        sayre@taftlaw.com
        Mark T. Hayden (0066162)
        mhayden@taftlaw.com
        Aaron M. Herzig (0079371)
        aherzig@taftlaw.com
        **TAFT STETTINIUS & HOLLISTER LLP**
        425 Walnut Street, Suite 1800
        Cincinnati, Ohio 45202-3957
        Phone: (513) 381-2838
        Fax: (513) 381-0205

        *and*

        **FRIEDMAN & WITTENSTEIN**
        A Professional Corporation
        Stuart I. Friedman (admitted *pro hac vice*)
        sfriedman&friedmanwittenstein.com
        Paul S. Grossman (admitted *pro hac vice*)
        pgrossman@friedmanwittenstein.com
        Jonathan Daugherty (admitted *pro hac vice*)
        jdaugherty@friedmanwittenstein.com
        600 Lexington Avenue
        New York, New York 10022
        Phone: (212) 750-8700

        *Attorneys for Plaintiff*
        *Dodge Data & Analytics LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2016, the foregoing document was filed using the Court's CM/ECF system, which will send electronic notification of the filing to all counsel of record.

        /s/ Russell S. Sayre