UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DODGE DATA & ANALYTICS LLC, | : | Case No. 1:15-cv-698 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| iSqFt, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS
DEFENDANTS' COUNTERCLAIM (Doc. 43)**

This civil action is before the Court on Plaintiff's motion to dismiss Defendants' Counterclaim (Doc. 43),[1] and the parties' responsive memoranda (Docs. 32, 33).[2]

## I. BACKGROUND FACTS

For purposes of this motion to dismiss, the Court must: (1) view the counterclaim in the light most favorable to the Defendants; and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

---

[1] Defendants include: iSqFt, Inc., Construction Market Data Group, LLC ("CMD"), Construction Data Corporation, LLC ("CDC"), and BidClerk, Inc. (collectively "Defendants"). iSqFt is a software-as-a-service company that licenses access to its construction software and databases to general contractors, subcontractors, manufacturers, and suppliers in the North American commercial construction industry. iSqFt acquired BidClerk in October 2014, CDC in April 2015, and CMD in August 2015. (Doc. 28 at ¶¶ 45-46).

[2] Defendants request oral argument. (Doc. 46 at 1). The Court finds that the pleadings are clear on their face, and that oral argument is not necessary. *See Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (J. Dlott) ("Local Rule 7.1(b)(2) leaves the court with discretion to grant a request for oral argument.").

Dodge Data provides Construction Project Information ("CPI").  (Doc. 28 at ¶ 20). CPI consists of "construction project information, building product information, construction plans and specifications, industry news, market research, and industry trends and forecasts."  (*Id.*)  Dodge Data sells its nationwide CPI product to customers "through web-based programs accessed by those customers who pay a subscription fee to Dodge." (*Id.* at ¶ 24).  The subscription "depend[s] upon the level of detail and geographical area in which the contractor [i]s interested, as well as the number of licenses purchased by the contractor."  (*Id.* at ¶ 26).

Dodge Data claims that Defendants are attempting to monopolize the market for nationwide CPI in the United States and Canada (the relevant market), in violation of the Sherman Antitrust Act.  Dodge Data alleges that Defendants' goal is to consolidate into one entity with market power, drive Dodge Data from the market, and acquire a 100% market share so that they can charge monopoly prices, reduce output, and stifle innovation to the detriment of consumers.

Dodge Data alleges that Defendants are attempting to achieve their goal through anticompetitive conduct, including a predatory pricing scheme in which they have offered prices to Dodge Data's customers (but not to their own customers), that are more than 85% below Dodge Data's prices and below any appropriate measure of Defendants' costs.  Defendants have also allegedly stolen and used Dodge Data's confidential customer information, infringed Dodge Data's trademarks, abused restrictive covenants,

2

and tortiously interfered with Dodge Data's business relationships.[3]

Defendants disagree with virtually all of these assertions. However, for purposes of their counterclaim (which is expressly conditional on the Court's acceptance of Dodge's allegations and arguments), Defendants treat these assertions as if they were true. Defendants allege that Dodge has admitted that it has priced below its own costs in order to win or retain customers in the "Nationwide CPI" market. Specifically, Dodge admits that it has "discount[ed] to unsustainable, unprofitable (*i.e.*, below its costs) levels" to keep one or more customers. (Doc. 28 at ¶ 63; Doc. 32 at 18-19). Defendants' investigation has revealed a number of instances in which Dodge slashed its prices to roughly half of what Defendants were quoting to potential customers. For example:

- Dodge recently signed a 3-year deal with a customer after quoting a price of approximately $60,000 per year, significantly less than half of Defendants' existing contract price of $142,000 per year. (Doc. 35 at ¶ 13(a)).

- Defendants had a contract with another customer for $69,000 per year. Dodge recently won the business because, according to the customer, Dodge quoted a price that was approximately "half" of CMD's price. (*Id.* at ¶ 13(b)).

- Dodge quoted another customer a price of $40,000, less than half the $90,000 price that Defendants had quoted. Although Defendants were able to retain the customer, they had to drop their price to $56,000 to do so. (*Id.* ¶ 13(b)). This is

---

[3] Dodge Data alleges claims for: (1) attempt to monopolize in violation of Section 2 of the Sherman Act; (2) conspiracy to monopolize in violation of Section 2 of the Sherman Act; (3) conspiracy in restraint of trade in violation of Section 1 of the Sherman Act; (4) trademark infringement of the "S" (Sweets) mark; (5) unfair competition concerning the "S" (Sweets) mark; (6) dilution of the Sweets mark under Ohio law; (7) violation of the Ohio Deceptive Trade Practices Act relating to the "S" (Sweets) mark; (8) trademark infringement of the BidPro mark; (9) federal unfair competition concerning the BidPro mark; (10) violation of the Deceptive Trade Practices Act relating to the BidPro mark; (11) tortious interference with prospective business relationships; (12) trespass to chattels; and (13) declaratory judgment.

3

- noteworthy in that it also shows that customers are willing to pay a premium for Defendants' subscription service because their data and user platform are superior to Dodge's.

- Furthermore, since filing the counterclaim, Defendants have learned of several additional instances in which customers informed them that Dodge was quoting prices significantly below Defendants' prices. In many cases, the customers sign deals with Defendants anyway, and pay a premium over Dodge's quoted price.

Based on these facts and Dodge's admissions that it was pricing below its costs, Defendants maintain that they have properly pleaded a counterclaim against Dodge for attempt to monopolize. Conversely, Dodge argues that a comparison between its amended complaint and Defendants' counterclaim is instructive. Dodge filed a 29-page, 189-paragraph Amended Complaint (Doc. 28), while Defendants filed a 4-page, 24 paragraph counterclaim. (Doc. 35).

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'" *Id*. (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id*.

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id*. (*citing* Fed. Rule Civ. P. 8(a)(2)).

### III.  ANALYSIS

Defendants allege a counterclaim for attempted monopolization in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2. A claim for attempted monopolization requires: "(1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success." *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 615 (6th Cir. 1993). Market strength that approaches monopoly power,

meaning the ability to control prices and exclude competition, is a necessary element for showing a dangerous probability of achieving monopoly power. *Id.* However, courts have not adopted a uniform standard regarding the threshold of what it takes to establish a monopoly power. "[M]arket share alone, however, is not enough to determine a firm's capacity to achieve monopoly . . . [t]he real test is whether [the defendants] possessed sufficient market power to achieve its aims." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982).

### A. Specific Intent to Monopolize

"Specific intent to monopolize may be inferred from evidence of anticompetitive conduct, but not from legitimate business practices aimed only at succeeding in competition." *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1432 (6th Cir. 1990).

Defendants argue that "an intent to destroy competition in the Relevant Market can be inferred from anticompetitive conduct." (Doc. 35 at ¶ 11). However, this statement is only a repetition of what Dodge alleged in its Amended Complaint about Defendants' scheme, and is not an allegation by the Defendants that Dodge itself ever had an intent to destroy competition in the Relevant Market. The only other reference to "intent" in Defendants' counterclaim is a statement that "[i]f Dodge's own allegations and arguments are accepted as true, then Dodge had and continues to have the specific intent to destroy competition in the Relevant Market…" (*Id.* at ¶ 21).

6

However, if Dodge's allegations and arguments are accepted as true, then Dodge would be entitled to summary judgment.  Moreover, the allegations that would be deemed resolved in Dodge's favor would include the fact that: (1) Defendants offered prices to Dodge's customers—but not to their own customers—that were as much as 85% below Dodge's prices to those same customers; (2) Defendants were told by their chief executive officer to do "whatever it takes to disrupt Dodge's business"; (3) Defendants used the Stolen Customer Information to target Dodge's customers; (4) Defendants provided bonuses to their sales people for converting Dodge's customers; (5) Defendants instructed their inside sales force to convert Dodge's customers no matter the cost; (6) Defendants priced below their variable and total costs; (7) Dodge suffered substantial damages as a result of Defendants' predatory pricing scheme; (8) Defendants had a specific intent to monopolize the Nationwide CPI market; and (9) Defendants had a dangerous probability of injuring competition.  (Doc. 28 at ¶¶ 58-66, 98).

In sum, the Court concludes that merely stating that "Dodge had the intent to monopolize" is insufficient, rather Defendants need to plead actual facts showing that intent.  The fact that Dodge was allegedly forced to respond to Defendants' predatory prices does not demonstrate such an intent.

### B.   Anticompetitive Conduct

Anticompetitive conduct is any conduct that "attempt[s] to exclude rivals on some basis other than efficiency." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).  "Anticompetitive conduct can come in too many different forms, and is

7

too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 951 (6th Cir. 2005).

The sole form of anticompetitive conduct alleged in Defendants' counterclaim is that "Dodge has engaged in anticompetitive conduct by engaging in predatory pricing." (Doc. 35 at ¶ 20).

### 1. *Below-cost pricing*

A defendant seeking to plead predatory pricing must plead that "the prices complained of are below an appropriate measure of its rival's costs" and that the plaintiff had a "dangerous probability … of recouping its investment in below-cost prices." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993).

> [W]e hold that to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a *prima facie* case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.

*Spirit Airlines, Inc.*, 431 F.3d at 938.[4]

---

[4] *See also Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 326 (6th Cir. 2015) (plaintiffs were allowed "the flexibility to apply a cost-based test other than average variable cost").

8

Defendants claim that Dodge has "admitted that it engaged in predatory pricing." (Doc. 35 at ¶ 12). The Court disagrees. Dodge never "admit[ed]" that it priced below cost in order to "attract" or "win" customers, as opposed to trying to retain existing customers. Dodge's amended complaint states that it was "forced" to lower its prices to unsustainable and unprofitable levels, but this is not an "admission" of "predatory pricing." (Doc. 35 at ¶ 63).[5] The Sixth Circuit has held that, "[i]t is not anticompetitive for a company to reduce prices to meet lower prices already being charged by competitors." *D.E. Rogers Assocs., Inc. v. Gardner-Denver Co.*, 718 F.2d 1431, 1435 (6th Cir. 1983). Defendants fail to allege any court that has ever held that defensive price reductions in the face of a predatory pricing scheme can render the victim of the scheme liable for predatory pricing itself. (Doc. 43 at 12).

Defendants argue that since this Court, in its April 28, 2016 Order, found that a specific intent to monopolize on the part of Defendants could be inferred from evidence of their anticompetitive conduct, then this Court should draw the same inference on the part of Dodge. Defendants also point to the Court's statement that if Defendants "were interested in maximizing profits, there was no reason to resort to prices that were so drastically below that which Dodge Data was offering." (Doc. 34 at 13, n.12).

---

[5] In its entirety, Paragraph 63 provides: "Dodge estimates that since November 2014, it has lost customers with millions of dollars in annual sales volume as a result of iSqFt/CMD's predatory pricing tactics. In addition, Dodge has lost at least a million dollars more in "price erosion," where it was forced to discount to unsustainable, unprofitable (i.e., below its costs) levels in order to retain a customer in response to CMD's predatory pricing."

9

According to Defendants, "[t]his reasoning must extend to Dodge's conduct here." (*Id.* at 15). The difference, however, is that Dodge filed a detailed, fact-laden amended complaint that spelled out Defendants' predatory pricing and other anticompetitive conduct,[6] whereas Defendants filed a bare bones counterclaim. Defendants cannot legitimately maintain that the allegations in their counterclaim should give rise to the same inferences as the numerous detailed allegations in Dodge's amended complaint.

Defendants argue that the notion that Dodge is meeting competition is not in the counterclaim and such an affirmative defense cannot be considered on a pleading motion. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("[A] motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon [an affirmative defense]."). However, in *Cataldo*, the court noted that the use of a Rule 12(b)(6) motion, which assumes the truth of the allegations in the complaint to seek dismissal of a complaint based on the statute of limitations, is generally inappropriate for that purpose because the statute of limitations is an affirmative defense—*i.e.*, a plaintiff does not have to allege in its complaint that its claim is not barred by the statute of limitations. *Id.* at 547. The court nevertheless affirmed the dismissal of the complaint because its allegations showed that the claim was time-barred. *Id.* at 552.

---

[6] Dodge provided specific examples of Defendants' prices compared to Dodge's prices; alleged that Defendants' prices were below variable and total costs; and alleged that it lost customers with millions of dollars in annual sales volume as a result of Defendants' predatory pricing tactics.

Here, however, Defendants have directly injected the issue of "meeting competition" into their own counterclaim by specifically citing Dodge's amended complaint in their counterclaim. (Doc. 35 at ¶ 12) ("Dodge has admitted that it engaged in predatory pricing that is below its average total cost and average variable cost). (*Id.* at ¶¶ 61-63). Dodge alleges in that paragraph that it lowered its price in order to retain a customer in response to Defendants' predatory pricing. If Defendants are alleging that such a purely defensive price reduction constitutes predatory pricing, then Dodge is certainly entitled to show that Defendants' argument is wrong as a matter of law.

Defendants also rely upon paragraph 13 of their counterclaim which states: "Furthermore, Dodge recently has been offering prices to Counterclaimants'' customers that are significantly below the prices charged by Counterclaimants – which Dodge has already claimed are below Dodge's costs. For example …" (Doc. 35 at ¶ 13). This allegation merely alleges that Dodge has offered prices "significantly below the prices charged by" Defendants. It does not contain an allegation that those prices were below Dodge's cost. Simply offering "low" prices, even prices lower than Defendants, is not enough to satisfy *Brooke Group*. There must be some allegation that the price charged by Dodge was actually below Dodge's costs.

"[D]efendants never actually allege that Dodge's prices were 'below an appropriate measure of [Dodge's] costs.'" (Doc. 43 at 13). That, of course, is the cornerstone of a predatory pricing case. *Brooke Group Ltd.*, 509 U.S. at 222, 224 (a plaintiff seeking to plead predatory pricing must plead, *inter alia*, that "the prices

11

complained of are below an appropriate measure of its rival's costs" and that the defendant had a "dangerous probability…of recouping its investment in below-cost prices."). Thus, without any allegation in their counterclaim that Defendants' prices were below Dodge's costs, Defendants' counterclaim fails as a matter of law.

### 2. *Dangerous probability of recouping the investment in below-cost pricing*

The next element of the predatory pricing analysis is whether there is a dangerous probability of recoupment, which means that the defendant could "obtain enough market power to set higher than competitive prices, and then [could] sustain those prices long enough to earn in excess profits what [it] earlier gave up in below-cost prices." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 590-91 (1986). Pleading a dangerous probability of recoupment requires two showings. (Doc. 34 at 15). First, the claimant must show a dangerous probability of successful monopolization, or, in other words, that the scheme alleged "could plausibly 'produc[e] the intended effects on the firm's rivals … [by] driving them from the market.'" *Id.* (quoting *Brooke Group*, 509 U.S. at 225). Second, the claimant must show that the defendants "could plausibly maintain supra-competitive prices after it has eliminated its rival from the market." *Id.*

Defendants alleged that "Dodge has a dangerous probability of successfully monopolizing the Relevant Market" because, as Dodge alleged in its amended complaint, "Dodge has a 50% share in the Relevant Market and that Relevant Market is dominated by two competitors." (Doc. 35 at ¶¶ 15-16, 22). However, "[a] firm that is playing

12

defense by lowering prices only to compete with the predatory pricing of another … has no real possibility (let alone a dangerous probability) of recouping its losses by achieving monopoly power." (Doc. 43 at 12).

Defendants' counterclaim used the phrase "dangerous probability" only twice: once to summarize what Dodge alleged in its amended complaint and once to assert that Dodge would have a dangerous probability of successfully monopolizing the market if Dodge's allegations were accepted as true. Defendants assert that they "have alleged that 'Dodge has a dangerous probability of successfully monopolizing the Relevant Market,'" and cite to paragraph 22 of their counterclaim as support. (Doc. 46 at 10). However, paragraph 22 states:

> 22. If Dodge's own allegations and arguments are accepted as true, Dodge has a dangerous probability of successfully monopolizing the Relevant Market.

(Doc. 35 at ¶ 22). If Dodge's allegations and arguments are accepted as true, the Defendants—not Dodge—have a dangerous probability of successfully monopolizing the Relevant Market.

Defendants argue "[t]hat Dodge could drive Defendants from the market by pricing below cost is no less plausible than Dodge's allegations that Defendants could drive Dodge from the market by supposedly pricing below cost." (Doc. 46 at 11). However, Defendants have provided no facts from which plausibility can be derived. Defendants maintain that they are allowed to plead "hypothetically" under Rule 8(d). (Doc. 46 at 11). Rule 8(d) allows a party to assert a claim "alternatively or

13

hypothetically," but that is not an excuse for failing to plead the essential elements of a claim or failing to satisfy the "plausibility" requirement of *Twombly* and *Iqbal*. However, "that a party may assert inconsistent claims or defenses [under Rule 8(d)(2) and (3)] does not license disregard of the requisite pleading standards. Inconsistency does not doom a claim, but implausibility does." *Weddle v. Smith & Nephew, Inc.*, No. 14-C-09549, 2016 U.S. Dist. LEXIS 48512, at *14 (N.D. Ill. Apr. 11, 2016).[7]

Accordingly, Defendants fail to allege a dangerous probability of recoupment.

### C. Dangerous Probability of Success[8]

The final element of the predatory pricing analysis is whether there is a dangerous probability of success, or whether Defendants could "obtain enough market power to set higher than competitive prices, and then [could] sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 590-91 (1986). In conducting this analysis, a court should analyze the predatory pricing scheme to determine whether the scheme alleged could plausibly "produc[e] the intended effects on the firm's rivals . . . [by] driving them from the market," and then analyze "the structure and conditions of the relevant market" in order to determine whether defendants could plausibly maintain

---

[7] *See also Dorley v. S. Fayetter Twp. Sch. Dist.*, 129 F. Supp. 3d 220, 236 (W.D. Pa. 2015) (inconsistent allegations "must still have a plausible basis grounded in fact").

[8] A "dangerous probability of success" requires "market strength that approaches monopoly power" and an examination of "barriers to entry." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 507 (6th Cir. 1983).

14

supra-competitive prices after it has eliminated its rival from the market. *Brooke Group Ltd.*, 509 U.S. at 225-27. Since this analysis is a "particularly fact-intensive inquiry," "[c]ourts typically should not resolve [it] at the pleading stage." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007).

In the counterclaim, Defendants state that "Dodge has also alleged" that a company with an approximately 50% market share in a market primarily dominated by two competitors has a dangerous probability of successfully monopolizing the market. (Doc. 35 at ¶ 15). However, without a specific allegation that Dodge had such a dangerous probability of success, Defendants' counterclaim is legally deficient.

Where an attempt to monopolize claim is based on predatory pricing, the "dangerous probability of success" element of the attempt to monopolize claim involves essentially the same analysis as the "dangerous probability of recouping" an investment in below-cost prices that is an element of a predatory pricing claim. *See, e.g., Felder's Collission Parts, Inc. v. Gen. Motors Co.*, 960 F. Supp. 2d 617, 630 (M.D. La. 2013) ("the recoupment prong of a predatory pricing claim overlaps with the third element of attempted monopolization"). The notion that Dodge could have a dangerous probability of driving Defendants from the market is completely implausible. Accepting the amended complaint as true, Dodge was simply responding defensively to Defendants' predatory pricing. There are no facts alleged that would suggest that Dodge was trying to eliminate Defendants as competitors.

15

Accordingly, Defendants' counterclaim for attempted monopolization fails as a matter of law.

### D. Leave to Amend

Rule 15(a)(2) provides that a court "should freely give leave [to amend a pleading] when justice so requires," but the Sixth Circuit has held that leave should be denied where there is "undue prejudice to the opposing party or futility of the proposed amendment." *Hayward v. Genworth Life Ins. Co.*, No. 1:08cv244, 2009 U.S. Dist. LEXIS 4189, at *3 (S.D. Ohio Jan. 22, 2009). "[T]he thrust of Rule 15 is to reinforce the principle that cases 'should be tried on their merits rather than the technicalities of the pleadings.'" *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986) (*quoting Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982)).

Generally, courts consider five factors in determining whether leave to amend should be granted, including: (1) undue delay; (2) bad faith; (3) repeated failure to cure deficiencies; (4) undue prejudice to the opposing party; and (5) futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Dodge claims that that granting Defendants' leave to amend the counterclaim would be futile. While the Court finds it unlikely, based on the allegations in the counterclaim, that Defendants can maintain a claim for attempted monopolization, given the thrust of Rule 15, this Court shall not preclude Defendants from trying.

16

## IV. CONCLUSION

For these reasons, Plaintiff's motion to dismiss (Doc. 43) is **GRANTED**. However, Defendants are granted leave to amend the counterclaim within **21 days** of the date of this Order.

    **IT IS SO ORDERED**.

Date:  9/29/16                                                         *s/ Timothy S. Black*
                                                                             Timothy S. Black
                                                                             United States District Judge